# APPENDIX 7

# In The Matter Of:

*Jeffrey Frank Klein v.*
*Just Energy Group, Inc., et al*

---

*Jeffrey Frank Klein*
*December 23, 2015*

---

*Morse Gantverg & Hodge Court Reporters, Inc*

Original File SM28.txt

Min-U-Script® with Word Index

This Page Intentionally Left Blank

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Jeffrey Frank Klein
December 23, 2015

---

**Page 1**

1　　　　IN THE UNITED STATES DISTRICT COURT

2　　　FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3　　　　　　　　　- - -

4　JEFFREY FRANK KLEIN,　　　　　　　)

5　　　　Plaintiff,　　　　　　　　　)

6　　vs.　　　　　　　　　　　) Civil Action
　　　　　　　　　　　　　　　) No. 14-1050

7　JUST ENERGY GROUP, INC., a Foreign )
　Corporation, JUST ENERGY LIMITED, a)

8　Delaware Corporation, JUST ENERGY　)
　PENNSYLVANIA CORP., a Delaware　　　)

9　Corporation, and JUST ENERGY OHIO, )
　LLC, a Texas Corporation,　　　　　　)

10　　　　Defendants.　- - -

11

12　　　Deposition of JEFFREY FRANK KLEIN
　　　　　Wednesday, December 23, 2015

13　　　　　　　　　- - -

14

15　　　　The deposition of JEFFREY FRANK KLEIN, one of
　the defendants herein called as a witness by the

16　defendant, pursuant to notice and the Federal Rules of
　Civil Procedure pertaining to the taking of

17　depositions, taken before me, the undersigned, Sandra
　Marchky, Notary Public in and for the Commonwealth of

18　Pennsylvania, at the offices of Buchanan Ingersoll &
　Rooney, P.C., 20th Floor, One Oxford Centre,

19　Pittsburgh, Pennsylvania 15219, commencing at 1:04
　o'clock p.m., the day and date above set forth.

20

21　　　COMPUTER-AIDED TRANSCRIPTION BY

22　　　　MORSE, GANTVERG & HODGE, INC.
　　　　　PITTSBURGH, PENNSYLVANIA

23　　　　　　　412-281-0189

24　　　　　　　　　- - -

25

---

**Page 2**

1　APPEARANCES:

2　　　　On behalf of the Plaintiff:

3　　　　　The Chiurazzi Law Group
　　　　　Adam G. Vahanian, Esquire

4　　　　　101 Smithfield Street
　　　　　Pittsburgh, Pennsylvania  15222

5　　　　On behalf of the Defendants:

6　　　　　Buchanan Ingersoll & Rooney, P.C.

7　　　　　Erin Hamilton, Esquire
　　　　　John F. Povilaitis, Esquire

8　　　　　One Oxford Centre, 20th Floor
　　　　　Pittsburgh, Pennsylvania  15219

10

11　　　　　EXAMINATION INDEX

12

13　JEFFREY FRANK KLEIN
　　BY MS. HAMILTON . . . . . . . . . . . . 4

14

15　　　　　EXHIBIT INDEX

16　1　　First Amended Complaint　　　　　MAR
　　　　　　　　　　　　　　　　　　　　31

17　2　　List of Just Energy Calls　　　　　48

18　3　　Screenshots of Google Voice Records　56

19　4　　Screenshot of Google Voice Records　62

20　5　　Screenshots of Google Voice Records　64

21　6　　Screenshot of Google Voice Records　66

22　7　　Screenshots of Google Voice Records　67

23　8　　Screenshot of Google Voice Settings　69

24　9　　Verizon Phone Records (2012)　　　74

25　10　Verizon Phone Records (2013)　　　75

---

**Page 3**

1　　　　EXHIBIT INDEX (CONTINUED)

2

11　Verizon Phone Records (2014)　　　78

12　Verizon Phone Records (Oct. 2013)　84

13　Plaintiff's Answers to Defendants' First　92
　　Request for Interrogatories Directed to
　　Plaintiff

14　Plaintiff's Answers to Defendants' First　95
　　Request for Production of Documents

15　Records of Cognitive Dynamic Therapy　114
　　Associates

---

**Page 4**

1　　　　JEFFREY FRANK KLEIN

2　the plaintiff herein, called as a witness by the

3　defendants, having been first duly sworn, as

4　hereinafter certified, was deposed and said as

5　follows:

6　　　　EXAMINATION

7　BY MS. HAMILTON:

8　　Q　Mr. Klein, you understand you're under oath

9　to tell the truth today?

10　　A　I do.

11　　Q　Is there anything that's preventing you

12　from telling the truth today?

13　　A　No.

14　　Q　Are you on any drugs, medication or alcohol

15　that would prevent you from telling the truth today?

16　　A　No.

17　　Q　When I ask you questions today, I need

18　verbal responses because the court reporter can't

19　record nods or things of that nature.  If you need

20　clarification for any question, ask me.  And if you

21　need a break at any time, just ask.

22　　A　Thank you.

23　　Q　Would you please state your full name for

24　the record?

25　　A　My name is Jeffrey Frank Klein, spelled

---

Jeffrey Frank Klein
December 23, 2015

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Page 5

1   K-l-e-i-n.
2      Q      What is your home address?
3      A      216 East Eighth Avenue, Apartment 1, in
4   Homestead, Pennsylvania 15120.
5      Q      Do you own or rent?
6      A      I rent.
7      Q      What is your birthday?
8      A      May 15th of 1972.
9      Q      What is your marital status?
10     A      I'm single -- I'm divorced.
11     Q      When were you divorced?
12     A      I believe 2003.
13     Q      How long were you married prior to your
14  divorce?
15     A      I was married six years prior to divorce.
16     Q      Do you currently pay alimony to your
17  ex-wife?
18     A      I do not.
19     Q      Have you ever paid alimony to your ex-wife?
20     A      No.
21     Q      Do you have any children?
22     A      I do.
23     Q      How many children?
24     A      I have one child.
25     Q      Is the mother your ex-wife?

Page 6

1      A      Yes.
2      Q      How old is your child?
3      A      15.
4      Q      Do you pay child support?
5      A      Not currently.
6      Q      Have you ever paid child support?
7      A      I have.
8      Q      When and how much?
9      A      From the time of the divorce until 2000 --
10  I don't remember exactly when it stopped -- probably
11  2008 or 2009, and it was about $90 a month.
12     Q      Why did it stop?
13     A      Mutual agreement.
14     Q      Are you currently behind in any child
15  support payments or owing any child support payments
16  to your ex-wife?
17     A      I pause because I don't owe any child
18  support payments to my ex-wife.  But by mutual
19  agreement, some of the expenses that we agreed to
20  divide, I do owe her some.
21     Q      How much money do you owe her?
22     A      I don't know offhand.
23     Q      Is it more than 1,000?
24     A      Yes.
25     Q      Is it more than 5,000?

Page 7

1      A      It could be, but I'm not sure about that.
2      Q      Is 5,000 a fair estimate, would you say?
3      A      I wouldn't.
4      Q      So you can't give me any estimate of how
5   much money you owe her?
6      A      I, unfortunately, can't, no.
7      Q      Do you have any other dependents?
8      A      No.
9      Q      We're going to go through your educational
10  background now.
11     A      Sure.
12     Q      Where did you go to high school?
13     A      West Bloomfield High School in West
14  Bloomfield, Michigan.
15     Q      When did you graduate?
16     A      1990.
17     Q      Did you go to college after high school?
18     A      I did.
19     Q      Where did you go to college?
20     A      I began my undergraduate schooling at
21  Eastern Michigan University, which is in Ypsilanti,
22  Michigan.  That's Y-p-s-i-l-a-n-t-i.
23     Q      Did you go straight from high school?
24     A      Yes.
25     Q      Did you graduate from Eastern Michigan?

Page 8

1      A      I did not.
2      Q      How long were you there for?
3      A      I was there for two and a half years.
4      Q      What did you study?
5      A      I studied telecommunication.
6      Q      Why did you leave after two and a half
7   years?
8      A      Transferred to Michigan State University.
9      Q      Why?
10     A      They had a better telecommunication
11  program.
12     Q      Did you graduate from Michigan State?
13     A      I did.
14     Q      What year?
15     A      1995.
16     Q      What was your degree in?
17     A      Telecommunication.
18     Q      How did you finance your undergraduate
19  degree in telecommunications?
20     A      My parents paid for it.
21     Q      After you graduated from Eastern Michigan,
22  did you ever obtain another degree?
23     A      I graduated from Michigan State.
24     Q      I'm sorry, from Michigan State.
25     A      I did, yes.

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Jeffrey Frank Klein
December 23, 2015

Page 9

1   Q    Did you work after Michigan State?
2   A    Yes.
3   Q    I'm just going to focus on education right
4   now.  So what was the next school you went to?
5   A    Fair enough.  Next school I went to was
6   Wayne State University Law School.
7   Q    When did you go there?
8   A    I began in 1999.
9   Q    So there was a -- how many year break was
10  there between Michigan State and Wayne State
11  University Law School?
12  A    That would have been about four years.
13  Sometimes seems longer.
14  Q    What made you decide to go to law school?
15  A    My father urged me to consider it.  And I
16  decided it was something I wanted to do.
17  Q    Your father was a lawyer, correct?
18  A    Yes.
19  Q    Was your mother an attorney as well?
20  A    She was.
21  Q    And when did you -- did you graduate from
22  Wayne State University School of Law?
23  A    I did.
24  Q    How long did it take you to graduate?
25  A    Three and a half years.

Page 10

1   Q    Why did it take you three and a half years
2   instead of three years?
3   A    I was going part time.
4   Q    How did you finance your law degree?
5   A    I worked.
6   Q    Where did you work?
7   A    A number of places.  Well, when I began, I
8   was working for Republic Bancorp Mortgage as a loan
9   officer.  And --
10  Q    Was that part-time employment?
11  A    No, that was full-time employment.  And
12  then in, I'm going to guess, April of my first year of
13  law school, I began clerking for a judge in the
14  Oakland County Circuit Court.  And that was where I
15  stayed until my last semester of law school.
16  Q    Did that pay?
17  A    Yes.  It was a full-time job.
18  Q    And were you able to finance your entire
19  law degree by working these jobs?
20  A    I did take out a private loan in my last
21  year.
22  Q    How much?
23  A    I'm going to -- I don't remember exactly,
24  but I recall it being around $40,000.
25  Q    And has that loan been paid off to date?

Page 11

1   A    Yes, it has.
2   Q    When you graduated law school, did you take
3   the bar exam?
4   A    I did.
5   Q    Which states?
6   A    Michigan.
7   Q    Any other states?
8   A    Nope.
9   Q    Did you pass?
10  A    I did.
11  Q    Do you have any other degrees?
12  A    I do.
13  Q    What's after your law degree?
14  A    I obtained another Bachelor Degree from
15  Eastern Michigan University in music.
16  Q    When did you go back to school for this
17  degree?
18  A    I began at Eastern Michigan in 2009.
19  Q    So how long was the break between your
20  graduation of law school and the beginning of your
21  BS -- I mean Bachelor of Science is fine -- but your
22  Bachelor's in music?
23  A    It was a Bachelor of Science, by the way.
24  Q    Okay.
25  A    Seven years.

Page 12

1   Q    Why did you decide to go back to school?
2   A    I became disenchanted with the practice of
3   law.
4   Q    Can you be more specific?
5   A    How much time do we have?
6   Q    Just a high level overview.
7   A    Just high level is that -- gosh, it's hard
8   to summarize that in a very succinct way because there
9   were a number of factors that played into it.
10  Ultimately, due to some circumstances that
11  involved, for example, the corporation that I was
12  working for ceasing operations in the state, and just
13  my own reevaluation what I wanted to do with my life
14  from that point on, I decided that I wanted to pursue
15  music instead of law.
16  Q    What type of music?  Are you a composer, a
17  musician?
18  A    I am an ethnomusicologist now.  At the time
19  I was intending to become a professional conductor.
20  Q    Did you graduate from Eastern Michigan with
21  a degree in music?
22  A    I did.
23  Q    What year did you graduate?
24  A    2010.
25  Q    How did you finance that degree?

Jeffrey Frank Klein
December 23, 2015

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

---

Page 13

1    A    Student loans.
2    Q    How much in student loans did you have to
3    take out to finance that degree?
4    A    I haven't looked at a statement from that
5    in a while.  But I'm going to guess 60 to 70,000 --
6    no, it couldn't have been that much.  Maybe 40,000.
7    Q    Is that loan still outstanding?
8    A    Yes.
9    Q    How much of it?
10   A    All of it.
11   Q    After you graduated with your music degree
12   from Eastern Michigan, did you pursue another degree?
13   A    I did.
14   Q    What degree was that?
15   A    That would be a Master's in music from
16   Bowling Green State University.
17   Q    When did you start there?
18   A    In 2010.
19   Q    How long were you there for?
20   A    I left Bowling Green in 2013 to move to
21   Pittsburgh.
22   Q    Did you obtain a degree from Bowling Green?
23   A    I did.
24   Q    What was the degree in?
25   A    In ethnomusicology.

---

Page 14

1    Q    A Master's?
2    A    A Master's, yes.
3    Q    How did you finance that degree?
4    A    That was through working, graduate
5    assistantship, and also student loans.
6    Q    How much in student loans did you take out?
7    A    That was probably in the neighborhood of
8    $60,000.
9    Q    Is that debt still outstanding?
10   A    It is.
11   Q    Do you have any other degrees?
12   A    That's all the degrees I have.
13   Q    Are you currently working towards another
14   degree?
15   A    I am.
16   Q    What are you working towards now?
17   A    I'm working towards a Ph.D. in
18   ethnomusicology from the University of Pittsburgh.
19   Q    Why did you come to the University of
20   Pittsburgh?
21   A    I got accepted.
22   Q    Fair enough.
23   A    I wish it were a more complex answer than
24   that.
25   Q    When do you anticipate achieving your

---

Page 15

1    Ph.D.?
2    A    2018 -- wait, what year, it's 2015 -- 2018.
3    Q    Is this a six-year program?
4    A    Like a five-year program basically.  It can
5    take longer.  It can take shorter.  But five years is
6    about average.
7    Q    How are you financing this degree?
8    A    I'm funded through the University.
9    Q    Have you had to take out any loans in
10   relation to this Ph.D.?
11   A    No.
12   Q    So the current outstanding student loan
13   that you have is related to your Master's Degree and
14   your music degree from Eastern Michigan?
15   A    Correct.
16   Q    And what would you say is the total of your
17   student loan debt right now?
18   A    Again, I haven't looked at a statement.  So
19   I would just be estimating.  Considering interest
20   accrued and the time spent, somewhere in the
21   neighborhood of 100,000 to 120,000.
22   Q    Do you make monthly payments?
23   A    I do not.  They are in deferral right now.
24   Q    How long of a deferral did you get?
25   A    They are in deferral while you are enrolled

---

Page 16

1    full time in school.  It is an automatic deferral.
2    Q    So while you are in your Ph.D. program,
3    they are deferred?
4    A    Correct.
5    Q    Do you have any other education since high
6    school that we haven't talked about?
7    A    I don't believe so, no.
8    Q    Starting from high school, I want to go
9    through your employment history.
10   A    Sure.
11   Q    Can you tell me about your first job after
12   high school?
13   A    This reminds me of applying for the Bar.
14   It's difficult because it was so long ago.  So I will
15   try to do the best I can in recalling.
16        After high school and through the end of my
17   degree at Michigan State, my employment was either
18   seasonal or part-time employment, at best.  I worked a
19   few retail jobs here and there.  I also worked at the
20   Interlochen Arts Camp during the summers -- or during
21   at least three of the summers during my undergraduate
22   education.
23   Q    So you had no full-time employment during
24   your undergraduate education?
25   A    No, I did not.  It was all part time or

---

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Jeffrey Frank Klein
December 23, 2015

---

**Page 17**

1  seasonal, typical student jobs.
2  Q    After you graduated from Eastern -- I'm
3  sorry -- from Michigan State with telecommunications,
4  what did you do in the time period between that and
5  when you went to law school work-wise?
6  A    I initially worked in radio, briefly.  It
7  was ultimately my intention to work in radio.  So I
8  got a job as an on-air personality in Traverse City,
9  Michigan.
10  Q    Was it a talk show or were you a DJ?
11  A    I was a DJ.
12  Q    How long did that last?
13  A    Three months.
14  Q    Why did it end?
15  A    I found myself not enjoying sitting in a
16  small room by myself in the middle of the night
17  talking to myself.
18  Q    Fair enough.  What did you do after -- was
19  that a full-time job?
20  A    That was part time.
21  Q    What else did you do in that time period
22  between your undergrad and law school?
23  A    Oh, plenty.  After that, I moved back to
24  the Detroit area and I started working in sales.  My
25  first sales job was in retail sales.  I worked for the

---

**Page 18**

1  Eddie Bauer home store.
2  Q    Was that full-time employment?
3  A    Just to save time, I'll do this as a
4  narrative, since I'm sure you will be quite thorough
5  in asking the questions.  I think it will save us a
6  little time.  So feel free to interrupt me if there's
7  something else you would like me to elaborate upon.
8       I began working at the Eddie Bauer home
9  store and I worked there for probably about eight
10  months.  And it was officially a part-time job, but I
11  was working from 30 to 40 hours a week.  That was at a
12  time when employers didn't need to provide you with
13  benefits if you were working 30 hours a week.
14       After that, I got my first full-time job at
15  a company called Pagenet where I was selling pagers to
16  businesses.  It was an outbound sales job, selling
17  pagers to businesses in the Metro Detroit area.
18       From there, I went on to sell office
19  equipment for a company called Lanier.  Our court
20  reporter may be familiar with Lanier because they
21  did -- they were famous for transcription equipment
22  that they sold to law firms.
23       After Lanier, I began working in mortgage
24  banking.  And I worked first for FirstPlus Financial.
25  And after they went out of business, I began working

---

**Page 19**

1  for Republic Bancorp Mortgage.  And I was a loan
2  officer for both of those companies.  And Republic
3  Bancorp Mortgage is where I was working -- those were
4  all full-time jobs -- Republic Bancorp Mortgage is
5  where I was working when I began law school.
6  Q    Were you fired from any of those jobs that
7  you just went through?
8  A    Nope.
9  Q    So, in law school you worked -- can you
10  tell me your work situation while you were in law
11  school?
12  A    Well, at the beginning, I was working for
13  Republic as a loan officer.  And then it might have
14  been February, but it might have been as late as
15  April, of my first year of law school, I got a job at
16  the Oakland County Circuit Court, clerking for one of
17  the judges there.  And that was a full-time job that I
18  stayed in until my last semester of law school.
19  Q    Why did you stop that job?
20  A    In order to shave some time off of my
21  schooling, I decided to take that last semester full
22  time.  And so I left the job so that I could take a
23  full course load of classes and finish up my degree in
24  three and a half years instead of four or four and a
25  half.

---

**Page 20**

1  Q    Did you graduate high school with any
2  honors?
3  A    I was the State of Michigan moot court
4  champ.  But I don't think that's what you are
5  referring to.  So I guess I did not.
6  Q    That's impressive.
7  A    It was a good year for --
8  Q    After law school, where did you work?
9  A    I should also include, since it was during
10  law school, during that last semester or maybe it was
11  the summer, I clerked at a law firm as well.
12  Q    Which law firm?
13  A    Collins Einhorn Farrell & Ulanoff.  I'm
14  sorry, but I can't spell Farrell or Ulanoff.
15       So I would have left the court right before
16  that summer and I would have gotten one summer worth
17  of clerking at Collins Einhorn.  And then the last
18  semester I wasn't working at all.  I was just focusing
19  on my studies.
20  Q    After law school?
21  A    After law school, I got a job at a small
22  boutique firm in West Bloomfield, Michigan called
23  Kullen and Kassab.
24  Q    What type of law did you practice there?
25  A    I was a commercial litigation associate.

---

Page 21

1  Q   How long were you in that job?
2  A   Four years approximately.
3  Q   Full time?
4  A   Yes.
5  Q   Why did you leave that job?
6  A   I got a different job.
7  Q   Were you seeking a different job or were
8  you terminated?
9  A   I was -- no. I was seeking a different
10  job.
11  Q   What job did you get after that?
12  A   I was working for Wolters Kluwer Financial
13  Services. And I was a compliance attorney for them.
14  Q   How many years were you doing that for?
15  A   Approximately, two years.
16  Q   And why did that job cease?
17  A   As I mentioned earlier, they closed their
18  operations in Michigan and consolidated all of their
19  compliance work in their St. Cloud, Minnesota office.
20  Q   Were you offered to go to Minnesota?
21  A   I was not.
22  Q   You were laid off essentially?
23  A   Yes.
24  Q   After you were laid off, did you have
25  another job or is that when you went back to school?

Page 22

1  A   I did. I attempted to open my own
2  appellate practice in Ann Arbor, Michigan.
3  Q   Any specific type of law apart from
4  appellate work?
5  A   Just appellate work.
6  Q   Just generally?
7  A   General appellate work.
8  Q   Criminal and civil?
9  A   Okay. I would have preferred to focus more
10  on civil. But that wasn't an explicit decision. I
11  would have taken criminal work. But the work that I
12  was focusing on trying to obtain the attorneys that I
13  was trying to network with were civil litigation
14  associates.
15  Q   Was this a solo practice?
16  A   Yes.
17  Q   Did you have any employees?
18  A   No.
19  Q   How long did this practice stay open for?
20  A   About four months, five months -- oh, wait,
21  let me correct that, no. Seven months.
22  Q   Was it a financially successful venture?
23  A   It was not.
24  Q   Did you lose money on it?
25  A   Yes.

Page 23

1  Q   Are you in any debt related to the money
2  lost on that firm?
3  A   No.
4  Q   Why did you close the firm down after seven
5  months?
6  A   Part of it was that the economy in Michigan
7  had taken a downturn and it was just not a good time
8  to start a firm. So the business didn't take off as I
9  had hoped it would. Part of it was my decision to go
10  back to school for music.
11  Q   After your own firm, what was your next job
12  that you had?
13  A   Since then, I have been in school. And so
14  the jobs that I've had have been part-time employment
15  or seasonal employment.
16  Q   So what year did you close your practice
17  down? I'm sorry.
18  A   That would have been 2008.
19  Q   So you haven't worked full-time since 2008?
20  A   Correct.
21  Q   What part-time jobs have you had since
22  2008?
23  A   I wrote for the school newspaper at Eastern
24  Michigan University.
25      I was a graduate assistant at Bowling Green

Page 24

1  State University for the Student Money Management
2  Services office.
3      I worked for a company called IntelliShop
4  where I proofread mystery shopping reports.
5      I worked for the Forrest Greason Golf
6  Course at Bowling Green State University.
7      This past summer I worked at Kennywood.
8      And I am a teaching assistant -- sorry, a
9  teaching fellow at University of Pittsburgh right now.
10  Q   Do these jobs pay hourly, typically?
11  A   The assistantships at the universities did
12  not. They paid a stipend, in addition to covering my
13  educational expenses.
14  Q   What was the stipend?
15  A   I believe at Bowling Green, it was in the
16  neighborhood of 8 or 9,000 dollars a year. My stipend
17  at Pitt is the about 18,000 a year.
18  Q   The other jobs, were they hourly?
19  A   Yes.
20  Q   And can you give me a range of typically
21  how much you were paid an hour at those jobs?
22  A   Anywhere from $8 to $15 an hour.
23  Q   Do you have any sort of employment right
24  now?
25  A   Other than my assistantship at the

Page 25

1  University, no -- I'm sorry, my fellowship at the
2  University.
3      Q    Have you ever declared personal bankruptcy?
4      A    Yes.
5      Q    When?
6      A    This is going to be, again, another guess
7  because I don't remember the exact year. But I think
8  it was 2007, sometime in that range.
9      Q    How much debt was discharged as part of
10 that bankruptcy?
11     A    I do not recall.
12     Q    Was it more than $100,000?
13     A    I don't believe so, because I don't believe
14 my mortgage was discharged in that bankruptcy. So
15 then it would not have been over $100,000.
16     Q    Where did you file for bankruptcy?
17     A    In Michigan.
18     Q    Eastern District?
19     A    Yes.
20     Q    And I assume you could find out how much
21 debt was discharged if you looked at your records?
22     A    It's a matter of public record. I no
23 longer have records from that time. So --
24     Q    So you don't know how much debt was
25 discharged, but you believe it was less than $100,000;

Page 26

1  is that correct?
2      A    Yes.
3      Q    What was primarily the source of that debt
4  that was discharged in the 2007 bankruptcy?
5      A    Consumer credit.
6      Q    There was no student loan debt discharged?
7      A    No.
8      Q    You said there was no mortgage debt
9  discharged as part of that bankruptcy either?
10     A    Correct.
11     Q    Have you ever filed bankruptcy a second --
12     A    Let me amend that.
13     Q    Okay.
14     A    I honestly don't recall whether the
15 mortgage debt was discharged. There was a mortgage at
16 a point in time. And I don't know whether that was
17 satisfied in foreclosure or whether it was discharged
18 as part of bankruptcy. I honestly have no idea. So I
19 guess I'm not remembering right now.
20     Q    What made you decide to declare bankruptcy
21 in 2007?
22     A    A lot of debt.
23     Q    And you noted a foreclosure. Your home was
24 foreclosed upon?
25     A    Correct.

Page 27

1      Q    You were the mortgagee?
2      A    Correct.
3      Q    How much debt was on that mortgage when it
4  was foreclosed upon?
5      A    Again, I don't remember exactly how much.
6      Q    Was it more than 100,000?
7      A    Yes.
8      Q    Where was that house located?
9      A    Waterford, Michigan.
10     Q    Who foreclosed on the house?
11     A    It was the first mortgagor, but I don't
12 recall what bank it was.
13     Q    But it was a bank?
14     A    Yes.
15     Q    Have you ever declared bankruptcy again
16 since 2007?
17     A    No.
18     Q    Are you currently in debt?
19     A    Yes.
20     Q    Tell me what debt you have right now.
21     A    We already talked about the student loan
22 debt.
23     Q    Apart from the student loan debt?
24     A    In addition to that, I have maybe $1,000 of
25 consumer credit that fluctuates as I pay it off or

Page 28

1  don't.
2      Q    Anything else?
3      A    No, I don't believe so.
4      Q    Are you up-to-date on your rent payments?
5      A    I am.
6      Q    And are you up-to-date on your credit card
7  payments?
8      A    Yes, I am.
9      Q    Do you have any debt to individuals?
10     A    Nope.
11     Q    What about your ex-wife?
12     A    Well, okay, yeah, I'm sorry. She's keeping
13 track of expenses related to my daughter that I'm not
14 able to pay right now. And we have an informal
15 agreement between ourselves that I will pay that back
16 when I'm able to.
17          So, yes, I do owe -- I do have debt that I
18 owe to her. I don't know exactly how much it is. I
19 haven't asked for an accounting of it.
20     Q    What's your ex-wife's name?
21     A    Her name is Randee, R-a-n-d-e-e, Black.
22     Q    Do you know what her phone number is?
23     A    Not offhand.
24     Q    Do you know what her address is?
25     A    Not offhand. She's in Farmington Hills,

Jeffrey Frank Klein
December 23, 2015

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Page 29

1  Michigan. I believe the street is Carollton. But I
2  don't know the exact address offhand.
3  Q  Could you get her contact information?
4  A  Yes, I could.
5  Q  What is your current source of income?
6  A  My fellowship at the University.
7  Q  That's $18,000 a year?
8  A  Approximately.
9  Q  And that's what you use to pay your living
10 expenses?
11 A  Correct.
12 Q  Have you ever been a party to a lawsuit
13 other than this one and your bankruptcy?
14 A  I believe I had one or two small claims in
15 Michigan.
16 Q  Tell me about them.
17 A  They would have both been with cellular
18 phone carriers.
19 Q  Let's start with the first one. What year
20 was the first lawsuit?
21 A  This is ancient history. Let me see if I
22 can remember. I don't recall the order.
23      So you asked the first one. I'm just going
24 to go in the order that I recall them, if that's okay.
25 Q  That's fine.

Page 30

1  A  There was one that related to a defect in
2  the cell phone equipment that I had purchased.
3  Q  So you were the plaintiff in this case?
4  A  I was the plaintiff in both cases.
5  Actually, they both, I believe, dealt with equipment
6  defect, and they were both settled within a week.
7  Q  Where did you file these cases?
8  A  Small claims court in my local community.
9  I believe they were both in Waterford.
10 Q  Michigan?
11 A  Yes.
12 Q  How much did you sue for in both of these
13 actions?
14 A  A few hundred dollars. Maybe as much as
15 1,000, if it was an expensive phone, but I don't think
16 it was.
17 Q  Who were the defendants?
18 A  One would have been Sprint Wireless, the
19 other would have been AT&T Wireless, I think.
20 Q  You said they both settled?
21 A  Yes.
22 Q  Both were settled?
23 A  Correct. I was pausing on the AT&T
24 Wireless, because before they were AT&T Wireless, they
25 went through different iterations of names, and I

Page 31

1  don't recall which one it might have been under. So
2  it might not have actually been AT&T Wireless, but it
3  was some precursor of AT&T Wireless.
4  Q  Can you give me just an approximate year
5  when these cases --
6  A  2004, 2006, approximately.
7  Q  Did you represent yourself in these cases?
8  A  I did.
9  Q  Have you ever been deposed before?
10 A  Nope.
11 Q  I'm going to mark your First Amended
12 Complaint in this matter as Exhibit 1.
13 A  Okay.
14      (Thereupon, Deposition Exhibit No. 1 was
15 marked for identification.)
16 Q  Do you recognize this document?
17 A  I do.
18 Q  What is this document?
19 A  This was my First Amended Complaint that I
20 filed in the present action.
21 Q  When you filed this, you were proceeding
22 pro se in this case, correct?
23 A  Correct.
24 Q  So you drafted this Complaint yourself,
25 correct?

Page 32

1  A  Correct.
2  Q  How did you choose the four defendants you
3  named in this lawsuit?
4  A  I did an internet search in Pennsylvania
5  and in Ohio with the department of corporations,
6  whatever the equivalent for that is -- was in
7  Pennsylvania and Ohio for Just Energy in both
8  jurisdictions.
9  Q  What jurisdictions?
10 A  I'm sorry. Pennsylvania and Ohio.
11 Q  You've named Just Energy Pennsylvania
12 Corporation as a defendant, correct?
13 A  Correct.
14 Q  You don't allege that that is the entity
15 that made the calls at issue in this case, correct?
16 You allege it was Just Energy Ohio in this Complaint,
17 correct?
18 A  I allege that the caller identified
19 themselves as Just Energy Ohio.
20 Q  Why do you think Just Energy Pennsylvania
21 is liable to you?
22 A  Because the majority of the phone calls
23 were placed to me while I was residing in
24 Pennsylvania. And as closely related entities, I
25 wanted to make sure that I was including any possible

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Jeffrey Frank Klein
December 23, 2015

---

Page 33

1 entities that could have been connected. In other
2 words, I didn't want to not include an entity that was
3 a party at interest and lose my right to include them
4 later.
5 Q   Is that the only reason why you named them
6 as a defendant?
7 A   Well, at the time I also didn't know who
8 had done what. So --
9 Q   As you sit here today, do you have any
10 reason to believe that Just Energy Pennsylvania placed
11 the calls that you allege occurred in this lawsuit?
12 A   I don't believe that I have enough
13 information to have determined which one of these
14 entities placed the phone calls, other than the fact
15 that the person placing the phone calls identified
16 themselves as being Just Energy Ohio.
17     I have come to learn that Just Energy Ohio
18 may not actually exist. So I actually don't know,
19 legally speaking, what entity placed the calls.
20 Q   Do you have any evidence that Just Energy
21 Pennsylvania placed these phone calls?
22 A   Not at this time.
23 Q   You also named Just Energy Limited as a
24 defendant?
25 A   Correct.

---

Page 34

1 Q   Why do you believe Just Energy Limited is
2 liable to you in this case?
3 A   Same reason as Just Energy Pennsylvania.
4 Q   Do you have any evidence today that Just
5 Energy Limited placed the phone calls in this lawsuit?
6 A   Similarly, I do not.
7 Q   Do you know whether the collection calls
8 that are the subject of this litigation were even made
9 by a Just Energy affiliate or whether they were made
10 by a collections company?
11 A   Could I ask you to define what you mean by
12 Just Energy affiliate?
13 Q   Any of these four defendants, any company
14 affiliated with Just Energy, within the Just Energy
15 umbrella.
16 A   And just to be sure, if you could repeat
17 the question again, so I make sure I'm answering the
18 right question.
19 Q   Certainly. Let me rephrase this. We'll
20 just do it differently.
21     You are aware in this case that Just Energy
22 has taken the position that these calls have been
23 placed by a third party agency, correct?
24 A   I am aware of that, yes.
25 Q   Do you have any evidence indicating that

---

Page 35

1 that's not true?
2 A   No, I do not.
3 Q   In paragraph 16 of your First Amended
4 Complaint, you allege that you have been a subscriber
5 to Google's Voice service, a Voice over IP, since
6 2010?
7 A   Correct.
8 Q   I have no idea what that is. Can you
9 explain to me exactly what Google Voice service is?
10 A   Google Voice service is offered by Google,
11 which I'm sure you are familiar with what Google is,
12 of course. They offer a number of different services,
13 in addition to just being a search engine. And one of
14 those is what I could best describe -- and I'm a
15 layman, I'm not a tech expert, so I'm sure there's a
16 better explanation of this than what I'll provide --
17 but what I can best describe as a virtual telephone
18 line.
19     So they assign you a telephone number, it's
20 a regular telephone number, with an area code,
21 wherever you want it. In the case of mine, it was a
22 419 area code, which is the local area code for
23 Bowling Green when I was there. And any calls made to
24 it go into Google's computers, however that works.
25 And you have your account set up to handle those calls

---

Page 36

1 in a certain way, however you want them to. They can
2 go directly to voice mail. You can use an
3 Android-based cell phone to connect through Wi-Fi to
4 the Google Voice service and receive those calls on
5 your cell phone, not over the cellular network, but
6 just over Wi-Fi, if you so choose. You can have them
7 forwarded to any number that you want to, which can
8 include your cell phone, your home phone, can include
9 any other type of phone that you can think of, or to
10 go straight through to the voice mail. You can also
11 receive text messages through the Google Voice
12 service.
13     So the calls are placed to the number and
14 then it gets handled however the subscriber sets it
15 up, whether it gets forwarded or just stops there,
16 whether it terminates.
17 Q   So why did you sign up for this service?
18 A   I wanted a local phone number while I was
19 in Bowling Green and I didn't want to change my
20 primary cell phone number.
21 Q   What was the cost of the service to you?
22 A   No cost.
23 Q   So, in paragraph 17, you allege that the
24 phone number that's associated with this Google
25 account was (419)359-0702?

Jeffrey Frank Klein
December 23, 2015

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

---

Page 37

1    A    Correct.
2    Q    Did you pick that number or was it assigned
3  to you by Google?
4    A    It was assigned to me by Google.
5    Q    Is this the only number that's associated
6  with your Google account?
7    A    Yes.
8    Q    If a call is made to that number, are you
9  charged by Google?
10   A    No.
11   Q    So when you set up Google Voice service,
12  what features did you sign up for?
13   A    It is not really signing up in the sense
14  that I think you are using the term. It's what you
15  activate. But yeah, so I had it forward calls
16  directly to my cell phone. And then I also set up a
17  voice mail so that if I wasn't accessible through that
18  or there was a failure in the system, at least callers
19  would get a voice mail.
20   Q    This voice mail was associated with your
21  Google account?
22   A    Correct.
23   Q    So it would be a separate voice mail than
24  your Verizon voice mail?
25   A    Correct.

---

Page 38

1    Q    Were there any charges for these
2  activations?
3    A    No.
4    Q    How were the calls routed from Google to
5  your cell phone?
6    A    That sounds like a tech question that I'm
7  not equipped to answer. It was over a cellular
8  network. It was through my Verizon cell phone,
9  Verizon Wireless. Any more detail than that, I can't
10  answer.
11   Q    So am I correct in understanding that you
12  activated a feature which connected the Google service
13  to your Verizon cell phone?
14   A    Yes.
15   Q    And your Verizon cell phone number is or
16  was (248)390-7498, correct?
17   A    7489.
18   Q    7489. So there's a separate number
19  associated with your Verizon account, correct?
20   A    Correct.
21   Q    What did you do to get these two accounts
22  linked?
23   A    I just entered my phone number into my
24  Google Voice account on the computer.
25   Q    So phone calls that came to Google were

---

Page 39

1  then directly routed to your Verizon phone?
2    A    Correct.
3    Q    Do you know if there's any delay or is it
4  sort of an immediate --
5    A    I don't know. I assume it was immediate or
6  fairly immediate. But I don't know. You can't really
7  tell unless you are in the presence of the person
8  calling and seeing it go through.
9    Q    That makes sense.
10   A    I assume it was immediate, but I don't have
11  any way to verify that.
12   Q    You mentioned earlier that you set up a
13  voice mail associated with that Google account?
14   A    Correct.
15   Q    Were those voice mails also delivered to
16  your Verizon phone?
17   A    I was alerted to the voice mails. So this
18  brings up something I forgot to mention before. You
19  can also set up how you want to be alerted to voice
20  mails. You can have the service send you a text
21  message to let you know there's a voice mail or send
22  you an email to let you know there's a voice mail.
23      So every time I would get a voice mail on
24  my Google Voice service, I would receive a text
25  message and an email that also contained what was

---

Page 40

1  ostensibly a transcription of the voice mail, but was
2  never, ever a very good transcription of the voice
3  mail.
4    Q    So the voice mails would not ring to your
5  Verizon phone?
6    A    The calls would. The voice mails would
7  ring -- because I received a text message, whatever
8  alert was set up for my text message, that would ring.
9    Q    Your phone would ring when you got a text
10  message?
11   A    My phone would actually ring up to three
12  times every time that I received a call via Google
13  Voice that went to voice mail. It would ring the
14  first time when the call was placed. It would ring
15  when the text message was sent to me, alerting me that
16  I had a voice mail. And then it would ring to alert
17  me that I had an email. And the email was the
18  notification that I received a voice mail.
19   Q    I guess I'm confused by the voice mail
20  feature. Why do you need a Google voice mail if you
21  have a Verizon voice mail?
22   A    The concern for me is that if, for example,
23  I am unable to -- my concern was basically technical
24  failure. If for some reason my Verizon voice mail
25  wouldn't pick it up, I wanted to ensure that calls

---

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Jeffrey Frank Klein
December 23, 2015

---

Page 41

1 placed to Google Voice were actually getting to a
2 voice mail.
3 So, if for some reason the translation from
4 Google Voice to Verizon didn't happen or there was
5 some dysfunction or malfunction and I didn't have the
6 Google Voice voice mail set up, I would have no way of
7 being contacted. So it served for me as sort of a
8 backup or a safeguard to ensure that when people
9 wanted to leave me messages, they were able to.
10 Q When you would receive one of these phone
11 calls, these debt collection phone calls, would they
12 ring to your Verizon phone like a normal call?
13 A Yes.
14 Q And would you answer them?
15 A No.
16 Q And so when you didn't answer them,
17 presumably they would go to voice mail?
18 A Yes.
19 Q Did they go to your Google voice mail or
20 your Verizon voice mail?
21 A They went to both. Let me clarify that.
22 They didn't go to both. It's not like I received two
23 voice mails for every call. Some went to the Verizon
24 voice mail. Some went to the Google voice mail.
25 Q Why?

---

Page 42

1 A You'd have to ask somebody at Google Voice
2 or Verizon.
3 Q You have no idea why some would go to one
4 service and some would go to the other?
5 A No.
6 Q You said that when you received a voice
7 mail, you would get then a follow-up text from Google
8 telling you that there had been a voice mail left on
9 your Google voice mail, correct?
10 A Yes. If it was a Google voice mail, I
11 would get a text and an email alerting me that I had a
12 voice mail.
13 Q And you signed up for those features,
14 correct?
15 A Correct.
16 Q You could have deactivated those features
17 at any time, presumably?
18 A Correct.
19 Q Does Verizon charge you for the calls that
20 are delivered from your Voice Google IP service?
21 A Verizon charges me a monthly rate. It does
22 not charge me extra for receiving Google Voice calls
23 than it would for any other call.
24 Q So you were never charged a fee for these
25 calls outside of what you already pay to Verizon?

---

Page 43

1 A Correct.
2 Q So you have no out-of-pocket expenses for
3 these calls as to Verizon or to Google?
4 A Well, there's of course, what I normally
5 pay to Verizon. But in addition to that, no.
6 Q And you would have had to pay that amount
7 to Verizon whether or not you received these calls,
8 correct?
9 A Correct.
10 Q In paragraph 19 of your Amended Complaint,
11 you allege Defendant Just Energy Ohio, LLC began
12 placing calls to the Voice number which is the Google
13 number, correct?
14 A Correct.
15 Q For the purposes of collecting a debt?
16 A Correct.
17 Q You allege this debt was associated with
18 someone named Phyllis Settles?
19 A Yes.
20 Q Were all the calls associated with this
21 debt related to Phyllis Settles?
22 A All that I'm aware of, yes.
23 Q Approximately, when did these calls start
24 in 2013?
25 A I don't recall the exact month. But it

---

Page 44

1 would have been early in 2013, because I was still in
2 my spring semester at Bowling Green State University
3 at that time. I was still in classes.
4 Q Would early spring be a fair --
5 A As late as -- it could have been earlier in
6 the semester. So sometime between February and April
7 I would estimate.
8 Q And you noted that you let these calls go
9 to voice mail?
10 A Correct.
11 Q And how did you know that they were a call
12 for debt collection calls? Did you recognize the
13 phone number, for example?
14 A No, I did not. I recognized that they were
15 debt collection phone calls -- at the time it was a
16 hunch because of the messages that were left. They
17 just sounded like debt collection phone calls.
18 Q Based on the ring?
19 A No, on the messages that were left.
20 Q So when your phone would ring, would you
21 answer it?
22 A No.
23 Q Ever?
24 A With respect to these calls?
25 A No. I mean what if it was your girlfriend

---

Jeffrey Frank Klein
December 23, 2015

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

---

**Page 45**

1  or your ex-wife, how did you distinguish between which
2  calls were personal and which calls were associated
3  with these debt collection calls?
4      A   Caller ID. I'm sorry if that was your
5  question. Didn't mean to make it more difficult.
6          If I recognized the number, I would answer
7  it. If I didn't, I wouldn't.
8      Q   All of the calls that you allege as part of
9  this lawsuit, were they all debt collection calls?
10     A   You would have to ask your clients that.
11 But they certainly sounded that way. They all sounded
12 like they were relating to the same subject matter of
13 the same type or they were the same types of messages.
14 So they all seemed like the same type of phone calls.
15     Q   These are your allegations. Are you
16 alleging that there was anything other than a debt
17 collection phone call?
18     A   I am not.
19     Q   Did you ever receive any calls associated
20 with this case that you are alleging were not related
21 to debt collection?
22     A   Not that I'm aware of.
23     Q   Were these calls, these debt collection
24 calls -- I'm going to call them the debt collection
25 calls for purposes of today.

---

**Page 46**

1      A   Fair enough.
2      Q   Were the debt collection calls always
3  automated, to your knowledge?
4      A   No.
5      Q   Tell me about that.
6      A   I assume you are talking about prerecorded
7  as opposed to a live person speaking?
8      Q   Yes, a prerecorded, yes.
9      A   Okay. I can only go off of the ones that
10 actually -- where a voice mail message was actually
11 left. The vast majority of them were clearly
12 prerecorded messages. But every once in a while I
13 could tell that it was a live person that was actually
14 delivering the message.
15     Q   Okay. How could you tell it was a live
16 person?
17     A   Maybe an occasional pause or a stutter over
18 a particular word or certain cues that you have that
19 you are talking to a live person as opposed to a
20 prerecorded. Prerecorded messages tend to be a little
21 too perfect for a normal conversation.
22     Q   So if you had to divide up, rough estimate,
23 would it be half recorded, half live?
24     A   Oh, no. Probably two-thirds to
25 three-quarters recorded and maybe a quarter to a third

---

**Page 47**

1  live.
2      Q   Do you have any evidence that would help us
3  figure out which were prerecorded and which were live?
4      A   Yes.
5      Q   What do you have?
6      A   I believe I provided to my attorney and
7  provided to you recordings that I made of a number of
8  the voice mails. Those were representative of the
9  ratios that I received over the entire course of these
10 phone calls.
11         So, if you were to listen to those and
12 determine which were prerecorded and which were live,
13 that would, I think, be representative of the ratio of
14 prerecorded to live.
15         Is it all right if we take a brief restroom
16 break at this point?
17     Q   Sure. That's fine.
18         (Recess taken.)
19     Q   Do you know anything about the calls that
20 were automated that were sent to you? Do you have any
21 information about the system that sent them?
22     A   No. You mean the system from the call
23 originators?
24     Q   Yes.
25     A   No, I don't.

---

**Page 48**

1      Q   Do you have any evidence that these debt
2  collection phone calls were directed to you on
3  purpose?
4      A   No.
5          (Thereupon, Deposition Exhibit No. 2 was
6          marked for identification.)
7      A   If I could clarify that answer, I don't
8  think that they were intentionally directed toward me
9  on purpose. But I do know at a point in time that
10 whoever was placing the call was made aware that they
11 were calling the wrong number and they continued. And
12 I have every reason to believe that that was done on
13 purpose. Why? I don't know. But --
14     Q   Why would a company continue to call you on
15 purpose knowing that you weren't the person they were
16 looking for?
17     A   You should ask your client that.
18     Q   Well, I have. And we have represented to
19 you --
20         MR. VAHANIAN: I'm going to object. It
21     calls for speculation.
22         MS. HAMILTON: That's fine.
23     A   My answer would have been I have no idea
24 anyway. So --
25     Q   All the calls you allege occurred in this

---

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Jeffrey Frank Klein
December 23, 2015

---

Page 49

1  case, did you listen to each one?
2     A    All the voice mails?
3     Q    Yes.
4     A    Not all the way through.
5     Q    Did you ever -- you say you generally let
6  them go to voice mail.  Did you ever pick up directly?
7     A    Once.
8     Q    And all the others went straight to voice
9  mail?
10    A    Correct.
11    Q    And you sometimes listened to them,
12 sometimes you didn't?
13    A    I always had to at least listen to part of
14 them so I could delete them.
15        MR. VAHANIAN:  Were we on a new exhibit?
16 Did I miss something?
17        MS. HAMILTON:  No, I'm getting back to it.
18    Q    Do you recognize this document, Mr. Klein?
19    A    I do.
20    Q    What is this?
21    A    This looks like a document that I prepared
22 logging the telephone calls that I received from Just
23 Energy.
24    Q    And these calls go from September 30, 2013
25 through August 19, 2014, correct?

---

Page 50

1     A    Correct.
2     Q    How did you create this document?
3     A    Microsoft Word -- or do you mean what was
4  the process?
5     Q    What was the process of creating this
6  document?
7     A    Every time I would receive a call, I would
8  open up the Word document on my computer and make an
9  entry as to the date and time that that call came in.
10    Q    Did you use any other sources to create
11 this list?
12    A    No.
13    Q    So, would you receive a call and you would
14 enter it on this log?
15    A    Correct.
16    Q    Why is the earliest call in September 2013
17 when you claim the calls started much earlier than
18 that?
19    A    I didn't see any reason to begin logging
20 them before then.
21    Q    If you look at the last page, there's a
22 three-month period of time where no calls are logged
23 between September 30, 2013 and January 30, 2014.
24    A    Yes.
25    Q    Why is there a giant three-month gap there?

---

Page 51

1     A    Because I misspoke earlier.  I forgot about
2  that the September one that was in here and I did use
3  another source.  I began making the log on January
4  30th.
5     Q    So you are changing your testimony?
6     A    I am, and I apologize for that.  The
7  September call, I went back through the Google Voice
8  logs to try to find the date that I believed I
9  called -- how did I make this?  Hold on.  I know, as
10 of January, I started doing this contemporaneously
11 with the phone calls.  The September 30th one, I went
12 back into my Google Voice records to try to find any
13 other instances of phone calls that I could in the
14 Google Voice records.  And that was one that I found.
15    Q    The 9/30?
16    A    Correct.
17    Q    And you didn't find any others, presumably?
18    A    Correct.
19    Q    What proof do you have that the calls on
20 this list occurred?
21    A    From the time that I began logging the
22 calls, contemporaneously, it was the fact that I was
23 doing them as they were occurring or as close
24 thereafter that I could get to my computer.  Aside
25 from that, I believe I have printed out copies of both

---

Page 52

1  Verizon Wireless phone bills and Google Voice records
2  that would substantiate at least the majority of
3  these.  I didn't go through them item by item to do a
4  one-by-one comparison.  But I would assume they
5  substantiate the majority of these, if not all of
6  them.
7     Q    So all the calls that you found in your
8  Verizon bills and Google records, are they reflected
9  in this list?
10    A    As I said, I didn't do a one-by-one
11 comparison between the bills and this list.  So I
12 can't answer that.
13    Q    So there may be calls in the Google record
14 or in the Verizon records that you allege that are not
15 included in this list?
16    A    There could be.
17    Q    We asked for a list of all the calls you
18 are alleging in discovery.
19        Is there a reason why you didn't include
20 all of those calls on this list?
21    A    Because I would have produced them to you
22 in the form of the bills.
23    Q    How am I supposed to figure out which calls
24 are the ones you are alleging?
25        MR. VAHANIAN:  Objection.  Speculation.

---

Page 53

1    Q    Is there a number that I should look for
2  that, you know, is associated with this?
3    A    May I confer with my attorney?
4       MR. VAHANIAN: Sure.
5       (Off record.)
6    A    There is a number alleged in my Complaint.
7  There is a number that the calls that showed up on
8  Caller ID, they all came from the same number. So
9  there's that.
10      In paragraph 30 of my First Amended
11  Complaint, it is (877)407-7575. Any numbers from that
12  number would have come from Just Energy.
13      Also during that time period, no calls that
14  I received from Google Voice came from blocked numbers
15  other than those from Just Energy. So anything that
16  was a blocked number would have been Just Energy as
17  well.
18   Q    How do you know that's true?
19   A    Because I don't give out that number to
20  people. I give out that number to select people
21  locally, people, acquaintances that I would know, to
22  my family at home. And I don't distribute it to
23  people.
24      And also in looking at the records as
25  compared with the voice mails, I never received calls

Page 54

1  with voice mails that were not from Just Energy. They
2  were from blocked numbers. And I wasn't receiving any
3  other phone calls from any other companies at the
4  time. So --
5    Q    How can you know that for sure?
6    A    That I wasn't receiving any calls from any
7  other companies at the time?
8    Q    From anybody?
9    A    Because I never got them.
10   Q    So you have stated you created this list,
11  Exhibit 2, as the calls came in?
12   A    Or as close thereafter as I was able to get
13  to a computer to log them, yes.
14   Q    We will agree these calls are dated to the
15  minute, correct?
16   A    Correct. With respect to that, let me just
17  point out that if I had to make a log of it, like a
18  couple of hours later, sometimes my phone would say
19  call 36 minutes ago and I would just subtract 36
20  minutes from the current time. So it's within a
21  minute or two of all the calls.
22   Q    Did you use the Google records to create
23  this list?
24   A    Other than the September 30th call?
25   Q    Uh-huh.

Page 55

1    A    I don't believe I did, no. I believe this
2  is contemporaneous.
3    Q    You talked about blocked calls. Did you
4  have the ability to block calls?
5    A    Not that I'm aware of -- or not that I was
6  aware of at the time.
7    Q    How did calls come to be blocked, the ones
8  you were talking about earlier?
9    A    Unidentified number, blocked number, it
10  would have come from your client's end of the call.
11   Q    Why would a caller block itself -- are you
12  saying --
13   A    Why would a debt collector have blocked
14  their number from appearing on Caller ID?
15   Q    So you are saying -- okay.
16      So you did not -- do you affirmatively have
17  the ability to block numbers to your Google account?
18   A    I'm not aware that I do, no.
19   Q    What about your --
20   A    If that's a feature that is offered, I'm
21  not aware of it.
22   Q    And Verizon?
23   A    Again, if that's a feature that's
24  available, I'm not aware of it. So no.
25      I have since learned that there are apps

Page 56

1  that are available for that.
2      And within the past six months or so, I've
3  downloaded an app called Mister Number which is
4  supposed to block these calls. Doesn't work very
5  well.
6    Q    So the calls on Exhibit 2, starting January
7  30, 2014, are all the calls you are alleging made from
8  that period onward reflected on this list?
9    A    Yes.
10   Q    So you are alleging there were additional
11  calls but they would be predating this January 30,
12  2014 deadline?
13   A    Correct.
14      (Thereupon, Deposition Exhibit No. 3 was
15      marked for identification.)
16   Q    For your information, I broke this out
17  based on the highlighted history tab here on the left.
18   A    Okay.
19   Q    Do you recognize this document or these
20  documents?
21   A    They look like screenshots of my computer
22  of my Google Voice records.
23   Q    These are documents you produced in this
24  case?
25   A    To definitively answer that, I would have

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Jeffrey Frank Klein
December 23, 2015

**Page 57**

1  to look at what we produced. But they look like what
2  I produced, yes.
3  Q    Did you create the screenshots for purposes
4  of this litigation?
5  A    Yes.
6  Q    When did you do these screenshots?
7  A    I honestly don't recall.
8  Q    Were they recent or were they at the time
9  the calls were made?
10 A    They would have been closer to the time
11 that I was preparing for the litigation. So they
12 would have been in 2014.
13 Q    Did you print them out at the time as well?
14 A    I've never printed them out. It's a lot of
15 pages to print.
16 Q    Do you know if there's any way to produce
17 these records in electronic form rather than through
18 screenshots?
19 A    I do not. There may well be, but I'm not
20 aware of one.
21 Q    There are calls included in these
22 screenshots that are not calls that you allege are
23 debt collection calls for purposes of this lawsuit,
24 correct?
25 A    Correct.

**Page 58**

1  Q    How do we know which are the numbers you
2  are alleging as part of this lawsuit and which ones
3  are not?
4  A    Any number that is the (877)407-7575 is.
5  And I am alleging that any number that displays as
6  unknown is as well.
7  Q    Have you ever compiled a master list of all
8  the calls you allege are these debt collection calls
9  from your various sources?
10 A    I've only compiled what I produced to you.
11 Q    Just this list number 2?
12 A    Yes.
13 Q    And this was made at the time? This list
14 was not based on the written records you've produced?
15 A    Correct.
16 Q    Do you know if all the calls you are
17 alleging that are debt collection calls for purposes
18 of this lawsuit contained in your Google history are
19 included on this list?
20 A    I do not know.
21 Q    What is this exactly? It looks like a
22 history of calls, essentially?
23 A    Correct.
24 Q    Can you explain essentially what this is to
25 me in a little more detail?

**Page 59**

1  A    Yes. Well, I mean I can try. The part
2  that's the screen within my browser, this is obviously
3  screenshoted off of -- in a Firefox browser. You can
4  see at the top of the tab, it says Google Voice which
5  indicates this is from Google Voice's web site or the
6  voice section of Google's web site.
7       There is -- this is set up into basically
8  two panels. There's a left side bar that gives me
9  options of what part of Google Voice I want to
10 navigate through, essentially a navigation bar. The
11 inbox would just be voice mails that are available. I
12 don't know what start is. I've never used it. So I
13 imagine that I could probably star certain things if I
14 wanted to, but I never have. Voice mails would be
15 voice mails. So I don't know what inbox would be. I
16 don't know if I made any screenshots of that or not.
17 We'd have to check the records. But these are all
18 different -- inbox is probably an aggregation of all
19 of these other categories, and then you can break it
20 down by voice mail, text, history. I don't know
21 what's under more.
22       You've highlighted history, so what would
23 be in the left -- sorry, the right panel would be a
24 list of phone calls that were either received, sent,
25 or missed.

**Page 60**

1  Q    So it looks like the first entry is dated
2  June 25, 2013. That's the earliest one --
3  A    Are these in chronological order?
4  Q    I tried to put them in chronological order,
5  yes.
6  A    If they are, then yes, the first one would
7  be June 25, 2013. My Google Voice account has no
8  records from earlier than that.
9  Q    Why not?
10 A    You will have to ask Google.
11 Q    So you have no evidence --
12 A    I'm sorry, June 13th. So at the bottom of
13 this screen --
14 Q    I'm sorry. I meant June 13th. The
15 question remains the same.
16 A    Right.
17 Q    So you have no record of debt collection
18 calls prior to Google -- you have no Google records of
19 these debt collection calls prior to this June 2013?
20 A    Correct.
21 Q    And you don't know why Google doesn't have
22 records then?
23 A    I do not know why.
24 Q    Is there a way to tell whether these were
25 phone calls or voice mails?

Jeffrey Frank Klein
December 23, 2015

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Page 61

1    A    They are all phone calls.  The phone call
2  then would ring a certain number of times and then go
3  to voice mail, just like a normal phone would.
4    Q    So they all went to voice mail if you
5  didn't answer them?
6    A    Unless the person hung up before.
7    Q    Do you know why some of the unknowns have
8  text, like you said, usually a poor transcription of
9  the message?
10    A    That is a transcription, yes, always a very
11  poor transcription.  But it's an automated
12  transcription of the voice mail.
13    Q    Do you know why some of the unknowns have
14  the transcription and some do not?
15    A    Those would be the ones where a voice mail
16  was left.  So if you look -- for example, I believe
17  it's the one, two, three, fourth page of the package
18  you handed me --
19    Q    Correct.
20    A    -- the first voice mail down, the first one
21  with transcription, if you look to the left of the
22  date, you will see a little voice mail icon that
23  indicates that a voice mail was left.
24    Q    Okay.  So when a voice mail was left, they
25  would do this transcription feature?

Page 62

1    A    Correct.
2    Q    So if no voice mail was left, you would
3  then not get a voice mail notification on your phone?
4    A    Correct.
5    Q    Would you not get an email notification on
6  your phone?
7    A    Correct.
8    Q    So it's only when there was an actual voice
9  mail that you would get these additional
10  notifications?
11    A    Correct.
12    Q    Did Google charge you for any of the debt
13  collection calls reflected in your Google history?
14    A    No.
15        (Thereupon, Deposition Exhibit No. 4 was
16    marked for identification.)
17    Q    This was another record -- I can represent
18  to you this was a record that was produced by your
19  attorney.  I made this one separate because you can
20  see on the left, inbox was highlighted as opposed to
21  history.
22        I was just wondering what is different
23  between this and the history ones we just looked at.
24  How did you produce this one?
25    A    As to what's different between that, that

Page 63

1  again you would have to ask Google.  But the reason
2  that I did some where I highlighted inbox and some
3  where I highlighted history is I wanted to make sure
4  that I was collecting and producing the most accurate
5  and complete records that I was able to.  So I don't
6  know if anything is contained in the inbox grouping
7  that's different from the history grouping.  So I don't
8  know.  I wanted to make sure I produced them both just
9  in case.
10    Q    Do you know why these only reflect calls
11  from April 2014, the inbox messages?
12    A    Is this the earliest, the inbox ones?
13    Q    Yes.  This was the only page that had inbox
14  highlighted, so presumably it came from the inbox tab.
15    A    So I don't recall, no, why I would have
16  only produced this.  I may have looked at it and seen
17  that -- I don't know.  I don't remember.
18    Q    Okay.  I forgot to ask you a question about
19  the prior exhibit.  I'm sorry.  If you can flip back
20  to Exhibit 3 really quickly.
21    A    Yes.
22    Q    If you see at the top of the pages, it
23  looks like there are 268 entries.  If you look at the
24  top right, it says 51 through 60 of 268, maybe 288.
25    A    Okay.

Page 64

1    Q    And then if you go in deeper, some of the
2  entries say a total of 358.
3        I was just wondered why the discrepancy, if
4  you know why some say there were 268 entries and some
5  of the pages indicate there were 358 entries?
6    A    I don't recall.  It is possible that I
7  didn't do all of the screenshots at the same time.  So
8  these phone calls continued until after I had filed
9  the litigation.  So I may have been taking screenshots
10  kind of as it was going along.  And so as more calls
11  came in, I would need to take screenshots to reflect
12  those.  That's a possibility.  But I don't know.
13        (Thereupon, Deposition Exhibit No. 5 was
14    marked for identification.)
15    Q    Exhibit 5, these questions are going to
16  start getting repetitive.
17    A    I understand you have to ask them.
18    Q    I can represent to you these are
19  screenshots that your lawyer provided to me.  I broke
20  these out because, if you see on the far left, the
21  more tab is highlighted.  So I assume that's how you
22  obtained these records?
23    A    Yes, correct.  My reason for doing so would
24  have been the same as the inbox as opposed to history
25  version.  I wanted to make sure I was getting as many

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Jeffrey Frank Klein
December 23, 2015

Page 65

1  screenshots of the calls that were on the Google Voice
2  record as I could.
3      Q   Do you know what the difference is between
4  more as opposed to history, for example?
5      A   I don't know.  And I assume that there
6  would be overlap.  That some would be contained under
7  multiple tabs.  I will call them tabs even though they
8  are not tabs.  I assume there's a lot of duplicate
9  between the different sections.  But I wanted to make
10  sure that I provided, again, as many different views
11  of the accounts so that you could cross-reference them
12  and make sure that you had gotten everything covered
13  and you weren't missing any of the phone calls, but
14  also see that they were consistent with each other.
15      Q   And I already asked you if you could
16  produce the history ones electronically.  I assume
17  your answer is the same for any of these?
18      A   Yeah.  For any of the Google Voice records
19  it's possible that they can be produced
20  electronically, but I have no idea how to do it.
21      Q   Were these printed out at the same time you
22  printed out the rest of the screenshots?
23      A   Again, I didn't print out anything just
24  because of the amount of paper.  I took the
25  screenshots.  And you can see at the top of the page

Page 66

1  in the upper right-hand corner, if you look through
2  the time that was on my computer system, you will note
3  that they were taken at different times.
4      Q   Okay.
5      A   So again my explanation for that is similar
6  to my explanation in the last question, that as these
7  calls were ongoing, I would have to return to capture
8  the new ones by screenshot that I hadn't already
9  captured on previous screenshots.
10      Q   It looks like under the more tab,
11  earliest call is September 30, 2013.  That's the
12  earliest one I saw.  You can feel free to look through
13  them.
14      A   Assuming that this is accurately reflecting
15  the documents that I produced, then, yes, September
16  30, 2013 would be the earliest call.
17      Q   Why are there no earlier calls reflected on
18  this when you allege these calls started in early
19  2013?
20      A   I have no idea to be honest with you.
21      Q   The rest of my questions are repetitive.
22  So we can move on.
23      Is that it on these documents?
24      Q   Yeah.  Although we have a few more
25  screenshots to go through.

Page 67

1      A   Then I'll leave them out here.
2          (Thereupon, Deposition Exhibit No. 6 was
3      marked for identification.)
4      Q   This is another screenshot that your lawyer
5  provided to me.  I can represent that to you.  This
6  one just looks different from all of the other
7  screenshots you provided.
8          So I was just hoping you could explain to
9  me, why is this one different from every other one we
10  have seen?
11      A   If you look at this, it actually is kind of
12  a blow-up or an expansion of the entries on the
13  earlier screenshots.  So if you were to click on one
14  of these, it would then blow up and expand.  So it's a
15  little bigger.
16      I included these -- I should say I included
17  this because I wanted to just be able to show on one
18  sheet of paper, on one document, what these
19  transcriptions look like and what the entry for voice
20  mails received look like.
21      Q   So there's nothing significant about this
22  call compared to any of the others?
23      A   It's very characteristic of the other
24  calls, yes, very representative, yes.  Basically, I
25  wanted to provide as many different views of the types

Page 68

1  of records that I had as possible.
2          (Thereupon, Deposition Exhibit No. 7 was
3      marked for identification.)
4      Q   So I can represent to you these are
5  documents your attorney produced to us and these are
6  the ones I separated out that have voice mail
7  highlighted.
8          So it appears that you got these by
9  pressing the voice mail tab; is that correct?
10      A   I would assume so, yes.
11      Q   The second page looks different than any
12  other screenshot.  I was wondering if you could
13  explain to me why this one looks different from
14  everything else.
15      A   I can only guess that when it was saved, it
16  was saved in portrait as opposed to landscape
17  orientation.  So that the whole thing wouldn't fit on
18  to one page the way the other ones did.
19      Q   So there's nothing different or significant
20  about these two calls?
21      A   No.  Nothing more so than the other calls
22  that I received.
23      Q   Looking at these calls, it looks like the
24  earliest call reflected from the voice mail tab of
25  your Google records is March 7, 2014.

Jeffrey Frank Klein
December 23, 2015

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Page 69

1      Do you know why there are no voice mails
2  prior to this time reflected?
3      A    I do not.
4      Q    Fair enough.  Okay.  There is one more
5  screenshot, but it's not of calls.
6           MR. VAHANIAN:  We'll let you have one
7  more.
8           (Thereupon, Deposition Exhibit No. 8 was
9      marked for identification.)
10     Q    Do you recognize this document, Mr. Klein?
11     A    Yes.
12     Q    Am I correct this appears to be a
13  screenshot of the settings page of your Google Voice
14  account?
15     A    Correct.
16     Q    And the number -- the Google number is
17  listed, correct?
18     A    Correct.
19     Q    And it looks like you had the option of
20  forwarding calls to a mobile number, correct?
21     A    Correct.
22     Q    And that number is associated with Verizon
23  and the number is (248)390-7489, correct?
24     A    Correct.
25     Q    And you affirmatively connected those two

Page 70

1  accounts, correct?
2      A    I did, correct.
3      Q    You also selected the option to receive
4  text messages to your Verizon phone; is that correct?
5      A    Correct.
6      Q    And you also selected the option to notify
7  you of new voice mails via text, correct?
8      A    Correct.
9      Q    And have those been your settings
10  throughout?  Have you changed those settings since you
11  have had your Google account?
12     A    I have not changed those settings, to the
13  best of my recollection.
14     Q    Now you could have disassociated your
15  Verizon phone from this Google account if you wanted
16  to at any time, correct?
17     A    Correct.
18     Q    And the same goes for the option of
19  receiving text messages?
20     A    Correct.
21     Q    And the notification of new voice mails,
22  correct?
23     A    Correct.
24     Q    We talked a little bit earlier today about
25  the voice mails you produced in this case, the audio

Page 71

1  voice mails, correct?
2      A    Yes.
3      Q    I believe you produced around ten.  Does
4  that sound like a correct estimate to you, around ten
5  voice mails?
6      A    I feel like there were more.  But I
7  produced what I had.  So --
8      Q    Those voice mails are dated from January
9  2014 to April 2014 on the file names.  Is that
10  consistent with your recollection of the voice mails
11  that you've produced?
12     A    I haven't looked at those since I -- since
13  I saved the files.  But that doesn't sound
14  inconsistent.
15     Q    How did you produce those?  Just walk me
16  through how you saved them and --
17     A    There were two types of voice mails -- I'm
18  sorry.
19     Q    Go ahead.
20     A    I didn't want to step over your question.
21          There were two ways that I recorded voice
22  mails, because as I mentioned earlier I received some
23  voice mails on my Verizon phone, and I received some
24  voice mails on -- through my Google Voice account.
25          For the Google Voice account, it allowed

Page 72

1  you to download the audio from the messages.  So those
2  would have been individual messages that I was able to
3  down load audio from.
4      For the Verizon voice mail, unfortunately
5  Verizon doesn't offer that type of an option.  So what
6  I recall doing -- and I thought that we had produced
7  this, I will double-check my records to make sure that
8  we did -- what I recall doing is just taking an audio
9  recorder, putting my phone on speaker and just
10  pressing record on the audio recorder while I played
11  back the phone calls, the voice mails in succession
12  that were on my Verizon voice mail.
13      It's possible that you have a file that has
14  multiple voice mails from Just Energy in one file.
15     Q    That's possible?
16     A    So that's possible.
17     Q    So you produced voice mails both from
18  Google and from Verizon?
19     A    I believe I did, yes.
20     Q    And presumably you collected them for
21  purposes of this case?
22     A    Correct.
23     Q    How did you select the ones you did to
24  produce?
25     A    The ones on my Verizon were just the ones

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Jeffrey Frank Klein
December 23, 2015

---

Page 73

1  that were in my inbox at the time. Voice mails
2  eventually expire and delete themselves. And voice
3  mailboxes fill up. So I wasn't able to get records.
4       And certainly at the beginning of these
5  calls, when I didn't realize that they would go on for
6  a year and a half, I wasn't -- I was just deleting
7  them because I thought they would stop. I didn't
8  think there was any reason to collect them. But once
9  I started collecting them, I tried to do as good a job
10 as I could of collecting as many as I could.
11      Q   Do you have any audio recording of the debt
12 collection calls that you haven't produced in this
13 case?
14      A   You are asking me if I have any that I
15 didn't produce?
16      Q   Uh-huh.
17      A   Not that I'm aware of, no.
18      Q   Are all of the voice mails that you
19 produced reflected on your Exhibit 2 list?
20      A   I would doubt it.
21      Q   How will we know the date of the voice
22 mails, the audio voice mails that you provided?
23      A   I believe the ones from Google Voice have
24 some type of reference to the time on them. But I
25 would have to listen to them to be sure. The ones on

---

Page 74

1  my Verizon voice mail, unfortunately, there's no
2  way -- they don't time stamp that I'm aware of -- or
3  maybe they do.
4       So if it's not on the audio, I don't know
5  how you would tie specific voice mails to instances
6  that are contained in my log directly. So unless
7  there's a time stamp on it, I really don't know how
8  you could tie it one-to-one on the list.
9       (Thereupon, Deposition Exhibit No. 9 was
10      marked for identification.)
11      Q   Moving on to Exhibit 9, Mr. Klein, you
12 produced your Verizon phone records in this case,
13 correct?
14      A   Correct.
15      Q   The ones I'm handing you right now I will
16 represent to you were the ones that you produced from
17 2012.
18      I just want to confirm you are alleging in
19 this case the debt collection calls started in 2013,
20 correct?
21      A   Correct.
22      Q   So why did you produce records from 2012?
23 Is there any significance to these records?
24      A   I think that was just as far back as
25 Verizon went.

---

Page 75

1       Q   So as far as you know, there are no debt
2  collection calls reflected in these records?
3       A   If these are the 2012 ones, then no.
4       Q   Okay. That's all I wanted to know about
5  that.
6       (Thereupon, Deposition Exhibit No. 10 was
7       marked for identification.)
8       A   I apologize we probably overproduced in
9  some areas.
10      Q   You can never overproduce in litigation.
11      A   Fair enough. But in the interest of being
12 complete and thorough, I just wanted to produce as
13 much as I could.
14      Q   I'm distributing Exhibit 10 now and these
15 are the records -- I can represent to you that these
16 are the records that your attorney produced to me, the
17 Verizon records from 2013.
18      A   This is a lot of sheets of paper.
19      Q   The entire year.
20      A   Wow.
21      Q   These are your Verizon -- you can take a
22 quick look through or take as much time as you need,
23 these are the 2013 Verizon phone records that you
24 produced in this case.
25      A   Okay.

---

Page 76

1       Q   Does that appear correct to you?
2       A   Certainly appears that way from a cursory
3  glance.
4       Q   Now, these records are associated with your
5  Verizon account number 2483907489?
6       A   Correct.
7       Q   It looks like you are on a plan with
8  Verizon?
9       A   Yes, as opposed to --
10      Q   Paying per call or --
11      A   Correct. I'm on a plan, yes.
12      Q   Can you tell me about the phone plan you
13 are on with Verizon?
14      A   It's Verizon. It's changed probably three
15 times since then. So I don't recall what it was. So
16 let me take a quick look and see if I can refresh my
17 recollection of what the plan at the time was.
18      Q   Sure.
19      A   Okay. I believe that I received -- yes,
20 here it is.
21      At that time I was paying for 450 minutes
22 per month for talk time of telephone calls. And then
23 I had unlimited texting. And at this point, at least
24 on the top one on this exhibit that you produced to
25 me, it was 2 gigabytes per month. There was a time

---

Jeffrey Frank Klein
December 23, 2015

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Page 77

1 when I was unlimited data as well. But this is 2
2 gigabytes of data, unlimited texting, and 455 minutes
3 of talk time.
4    Q    So you paid a set amount every month and if
5 you used features outside of your plan, you would be
6 charged extra?
7    A    Correct.
8    Q    And that was the case for all of 2013, you
9 were on a plan?
10    A    I was on a plan. I don't remember whether
11 it was the same plan the whole time. But it probably
12 was or could have been. Similar type of plan though.
13    Q    And just to confirm, this is the cell phone
14 that you allege the debt collection calls were
15 forwarded to, correct?
16    A    Correct.
17    Q    I looked through these records and could
18 not find that 877 call number on here anywhere.
19       Can you point out to me where the debt
20 collection calls are reflected in these records
21 because I --
22    A    On this one I cannot, no.
23    Q    Looking through these records, I couldn't
24 find a single entry of what would be the debt
25 collection phone calls in this case; am I incorrect?

Page 78

1    A    I will take you at your word for that.
2    Q    Can you look through and point one out for
3 me?
4    A    It will take a couple of minutes, I'm sure.
5 It's a lot of sheets.
6    Q    Okay.
7    A    There's one that is on October 9 at 8:06
8 P.M.
9    Q    That looks like -- that's the call you made
10 to Just Energy, correct, because it says the
11 origination is Pittsburgh -- or Homestead, PA?
12    A    Yes.
13    Q    So that's actually a call you made to them?
14    A    Okay. Fair enough. I didn't notice that.
15 Thank you for pointing that out.
16    Q    You're welcome.
17    A    Yeah. Unfortunately, Google Voice gives
18 you little icons, Verizon doesn't to tell you whether
19 it was outgoing or incoming.
20       All right. I've looked through all of them
21 and I don't see anything other than the outgoing call
22 that I noted earlier.
23    Q    Is it fair to say that these Verizon phone
24 records don't reflect the existence of the debt
25 collection calls in this case?

Page 79

1    A    That's correct.
2       (Thereupon, Deposition Exhibit No. 11 was
3 marked for identification.)
4    Q    Moving on to Exhibit 11, I can represent to
5 you these documents were produced to me by your
6 attorney and these are your Verizon phone records from
7 2014, so far as I can tell.
8       Do you want to flip through them quickly
9 and confirm that that is correct, as far as you can
10 tell?
11    A    They look like they are my records up
12 through March of 2014 -- or sorry, no. They look like
13 they are my records up through February 18 of 2014.
14    Q    So, I have the same question for you with
15 this set. I looked through and didn't see any debt
16 collection calls.
17       Can you look through and confirm that for
18 me? There's only two bills. So hopefully it won't
19 take that long.
20    A    If you give me a moment. There's one on
21 February 6 -- it says origination Pittsburgh. And I'm
22 pretty sure I didn't call Just Energy in February at
23 all.
24    Q    So which number do you allege came from --
25 there's several calls on February 6.

Page 80

1    A    February 6 at 6:39 p.m.
2    Q    Okay.
3    A    Which makes me wonder whether origination
4 just indicates where I was at the time because
5 everything on here -- and now as I look back through
6 the other bills, they seem to be where I was at the
7 time. So --
8    Q    They have the destination as being -- this
9 February 6 call, it says it was originated in
10 Pittsburgh and it was to a toll free number.
11    A    Yes. But if you look at the origination of
12 everything on here, they all say wherever I was. And
13 I know I receive incoming calls on my phone. So I
14 don't know -- I don't know what that actually means in
15 Verizon parlance.
16    Q    So the February 6 call, is that --
17    A    The February 6 call, I did not call Just
18 Energy on that date at that time.
19    Q    So do you think this might be one of the
20 debt collection calls?
21    A    It could be.
22    Q    Do you know for sure?
23    A    Well, I mean it would be related to Just
24 Energy. So yes, I would assume that it is.
25    Q    Other than that one call on February 6, are

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Page 81

1 there any others?
2    A   No.
3    Q   So with the exception of that possible debt
4 collection call on February 6, will you agree there
5 are no other debt collection calls reflected in these
6 records?
7    A   I would again go back to the one in October
8 of 2013, now having seen that all of the originations
9 are wherever I was, I don't think that origination --
10 I wouldn't agree that origination reflects where the
11 call originated from, but where I was when the call
12 happened. So I don't know whether -- let me find that
13 one.
14    Q   Well, if we look at --
15    A   Did I say October 9, is that what it was?
16    Q   Yes, it was October 9 at 8:06 p.m.
17    A   Let me get to that one. That was easy.
18 Let me look at what it says here.
19        This looks like the same as the February
20 one, where this one originated at Homestead,
21 destination toll free CL, which is exactly what the
22 February one said. Duration of two minutes. So I
23 don't know whether that was an incoming or outgoing
24 phone call on October 9.
25    Q   Mr. Klein, if you look at Exhibit 2, you

Page 82

1 write here your first demand to stop was on October 9,
2 2013 at 8:06.
3    A   Then that was probably the time that I
4 called.
5    Q   So the October 9 call was an outgoing call
6 made by you?
7    A   Yes. That makes sense.
8    Q   So these Verizon bills from 2014, you only
9 produced up to February 18, 2014, correct?
10    A   Correct.
11    Q   But you allege these calls persisted
12 through August 2014, correct?
13    A   Yes. And I apologize for not producing the
14 other ones. I didn't realize these were incomplete.
15 I can go ahead and print out additional bills and
16 produce them to you.
17    MR. VAHANIAN: Sure.
18    Q   That sounds good. Thank you.
19    A   My apologies.
20    Q   So moving on to the cease and desist calls,
21 I'll call them, you allege in your Complaint -- let's
22 look at it, shall we, Exhibit 1?
23    A   Sure.
24    Q   In paragraph 31, you allege on or about
25 September 30, 2013, plaintiff placed a telephone call

Page 83

1 to Just Energy Ohio to advise it that he was not
2 associated with Phyllis M. Settles, that it had the
3 wrong number for Phyllis Settles, and demand that it
4 cease and desist all future calls; is that correct?
5    A   Yes.
6    Q   When we look at Exhibit 2, you write on the
7 top, first demand to stop 10/9/2013?
8    A   Which one is Exhibit 2 again?
9    Q   Exhibit 2.
10    A   Oh, there it is.
11    Q   Is this the call you are alleging in
12 paragraph 31 of your Amended Complaint?
13    A   Yes, it is. Whether -- yes, it is.
14    Q   That's what I figured. And so in paragraph
15 31 of your Amended Complaint, it's not September 30,
16 we have more clarity now, it's this October 9, 2013.
17 So you were close.
18    A   There was also a call on September 30 of
19 2013 that's reflected in the Google Voice records. I
20 honestly don't remember which one. So we have a call
21 on October 9 that's on the Verizon record. We have a
22 call on September 30th in the Voice records. I
23 honestly don't recall which one was the demand to
24 stop, but it was one of those two.
25    Q   So we have actually -- we have already

Page 84

1 looked at this, but just to see if we can clarify
2 here.
3        Exhibit 12, this is your October 2013
4 Verizon bill.
5        (Thereupon, Deposition Exhibit No. 12 was
6    marked for identification.)
7    Q   If you look at October 9, there is an entry
8 here, it's the one we just looked at?
9    A   Correct.
10    Q   So I just wanted to confirm, is this the
11 record of the call that you allege you made asking for
12 the debt collection calls to cease?
13    A   Based upon what was just looked at, I
14 actually don't remember whether this was that call or
15 whether it occurred on September 30.
16    Q   September 30, 5:49. Okay.
17        If you look at Exhibit 3, which was your
18 history of Google Voice --
19    A   Do you by chance have a spare pen because I
20 haven't been marking these?
21    MR. VAHANIAN: It's not at spare. Here's
22    one.
23    A   I got it. Since we are shuffling back and
24 forth, I want to make sure that we are looking at the
25 same document. So the log of calls was 2?

Jeffrey Frank Klein
December 23, 2015

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Page 85

1  Q    Correct.
2  A    The Amended Complaint was 1.
3  Q    Exhibit 3, I believe, is the Google Voice
4  screenshots with the history tab highlighted.
5  A    Okay. Thank you.
6  Q    If you look at the third page --
7  A    That's what we are on right now?
8  Q    Yes.
9  A    Would you mind, just before we go on, if I
10  labeled each of these so I make sure we got the right
11  ones?
12      Was 4 the -- these are out of order for me.
13  Which one was 4?
14  Q    Four was the Google Voice screenshot of the
15  inbox. It was a single page.
16  A    Okay. Thank you. And then 5 would have
17  been voice mails.
18  Q    Five is the screenshots of the more tab,
19  the Google screenshots with the more tab highlighted.
20  A    There it is. Thank you. That's 5.
21  Q    Six is the single voice mail screenshot.
22  A    Okay.
23  Q    Seven are the Google screenshots of voice
24  mails.
25  A    Seven.

Page 86

1  Q    Eight is the settings screenshot.
2  Nine are your 2012 Verizon bills. Ten are your 2013
3  Verizon bills. Eleven are your 2014 Verizon bills.
4  A    And then 12 is the October --
5  Q    October, correct.
6  A    Thank you. Sorry about the interruption.
7  I want to make sure we are on the same page literally.
8      So we are on 3 right now?
9  Q    Exhibit 3, third page.
10  A    Thank you. Okay.
11  Q    The third entry down is September 30, 2013
12  at 5:49 P.M.
13  A    Correct.
14  Q    If I compare that to your Exhibit 2, the
15  last entry listed is an incoming call at September 30,
16  2013 at 5:54 P.M.
17      Based on your Google screenshot --
18  A    5:49 p.m.
19  Q    Yes. Based on the Google screenshot, this
20  is an incoming call, correct?
21  A    It has a green arrow. That looks like an
22  incoming call, yes.
23  Q    It's listed on your history page?
24  A    That's correct.
25  Q    So piecing this all together, can we agree

Page 87

1  that you called Just -- or you called whoever -- the
2  first cease and desist call was made on October 9 and
3  that the September 30 was actually an incoming call?
4  A    It looks that way. I would agree, yes.
5  Q    Okay. I just wanted to clarify.
6  A    Thank you. Yes.
7  Q    So when you made that first phone call, how
8  did you select the number that you selected?
9  A    I called the (877)407-7575 number.
10  Q    That's the number you allege the calls were
11  coming from?
12  A    Yes. That's what was showing up on my
13  Caller ID, yes.
14  Q    Is there any record of the call aside from
15  your Verizon phone bill from October 2013?
16  A    No. I don't have any record of it.
17  Q    That's fine. The bill, you can look at it
18  if you like, but it reflects it was a two-minute phone
19  call.
20      Is that consistent with your recollection?
21  A    That sounds correct, yes.
22  Q    Who did you speak to?
23  A    I spoke to a man. But other than that, I
24  don't know.
25  Q    Did a man answer the phone or was there an

Page 88

1  automated system that you had to go through first to
2  get to a person?
3  A    No. Actually, I believe a man answered the
4  phone.
5  Q    Did he identify himself?
6  A    I don't believe so.
7  Q    Did he identify what company he was
8  affiliated with?
9  A    Yes.
10  Q    What did he say?
11  A    Just Energy Ohio.
12  Q    What did you say to him?
13  A    I don't recall the exact words that I used.
14  But I advised him that I was calling him because I had
15  been receiving calls from this number, they were calls
16  for somebody else, I was not that person, I don't know
17  that person, and that I am demanding that they cease
18  and desist calling me immediately.
19  Q    Anything else?
20  A    Let's see. I'm not the person. I don't
21  know the person. Stop calling immediately. I believe
22  that was it.
23  Q    Okay. How did he respond to you?
24  A    He seemed a little flustered, as I recall,
25  as if he didn't really know what to do, didn't know

Page 89

1  how to respond.  And if I recall, I believe I repeated
2  that I am not this person, that I don't know who this
3  person is, and I'm ordering you to stop calling me
4  immediately.  And I think he confirmed -- I believe
5  rather than asking something like is that okay, I
6  believe I asked him whether he understood or not.  And
7  he confirmed that he did and then I hung up.  It was a
8  very short call.
9    Q    Did he indicate that the calls would stop?
10  What did he -- anything?
11    A    He confirmed that he understood what I had
12  said.  And he made no further statements at least that
13  I recall.
14    Q    You can't recall any affirmative
15  representations he made to you other than that he
16  understood your --
17    A    Correct.
18    Q    Going back to Exhibit 1 -- now my exhibits
19  are out of order -- paragraph 34 of your First Amended
20  Complaint, you wrote, sometime in late December 2013
21  or early January 2014, you answered one of the debt
22  collection calls and advised a representative that you
23  were not associated with Phyllis Settles, that the
24  number was wrong, and demanded them to cease and
25  desist all future debt collection calls.

Page 90

1    A    Correct.
2    Q    Do you have any greater clarity now when
3  that phone call occurred, anything more specific than
4  what you allege in your Complaint?
5    A    No.  I know that it was during -- it was
6  during a semester break at that time because I was not
7  in classes at the time.  Beyond that -- I believe it
8  was later -- I believe it was in January, but I can't
9  be sure when that was.
10    Q    How did you get to speak to a person, if
11  the call -- I assume it was an incoming call, correct?
12    A    Correct.
13    Q    Was it an automated call or a live call?
14    A    No.  This was a live call, actually.
15    Q    So you spoke directly to the person?
16    A    Yes.
17    Q    And what did you say to them?
18    A    Again, I indicated that I'm not Phyllis M.
19  Settles, I don't know who Phyllis M. Settles is, and I
20  demand that you cease and desist calls immediately.
21    I believe also at the time I mentioned that
22  I already ordered you to stop calling -- not ordered
23  you -- but ordered them to stop calling.  I believe I
24  did that as well.  I added that into the demand.
25    Q    Do you know who the person was you were

Page 91

1  speaking to?
2    A    No.  This time it was a male as well.  I
3  believe he had an Indian accent.  And it sounded
4  similar to the voice of some of the live messages that
5  I received on voice mail.  But I can't be certain that
6  was the same person.
7    Q    What did he say to you in response?
8    A    I don't recall.  Again, I believe I asked
9  whether he understood or not.  And I believe he
10  acknowledged that he did.  But I don't recall that he
11  made any other statements or representations or said
12  anything else.
13    Q    Do you have any written documentation of
14  this call?
15    A    No.
16    Q    Do you have any audio documentation of this
17  call?
18    A    No.
19    Q    Do you have any evidence that this call
20  occurred?
21    A    No.  Other than my testimony.
22    Q    Other than your testimony, sure.
23    So when I went through your -- I'm done
24  with those exhibits for now.
25    A    Okay.

Page 92

1    Q    When I went through your document
2  production, I noticed that you had included Just
3  Energy's consolidated 2013 financial statements?
4    A    Correct.
5    Q    And I was wondered why you included those
6  in your production.
7    A    They were part of my research to learn
8  about Just Energy's operations and figure out what
9  they did, where they did it, just get more information
10  about a prospective defendant in a lawsuit.  Part of
11  my due diligence.
12    Q    Okay.  And I also saw you produced Just
13  Energy's 2014 annual report?
14    A    Correct.
15    Q    And what is the relevance of that to your
16  case?
17    A    Again, same thing.  And I apologize.  I
18  think I was assuming you were talking about the annual
19  report in your first question.
20    What was the first question regarding?
21    Q    It was consolidated statements.
22    A    Okay.  Part and parcel of the same due
23  diligence process where I was trying to gather as much
24  information about Just Energy as I could.
25    (Thereupon, Deposition Exhibit No. 13 was

Jeffrey Frank Klein
December 23, 2015

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Page 93

1    marked for identification.)
2    Q    Mr. Klein, I'm handing you your response to
3    our interrogatory request; is that correct?
4    A    That's what it looks like, yes.
5    Q    I have a few questions about a few of your
6    answers.  If we can go to interrogatory number 3.
7    A    Okay.
8    Q    We asked you to provide any medical
9    professional who's provided you with treatment as a
10   result of your allegations that these calls aggravated
11   your Major Depressive Disorder and Generalized Anxiety
12   Disorder, correct?
13   A    Yes.
14   Q    And you responded Joshua Gregson?
15   A    Yes.
16   Q    Is there anyone other than Joshua, is there
17   anyone missing here?
18   A    No.  I just wanted to make sure that there
19   wasn't anybody that I was just not recalling offhand.
20   But no.
21   Q    Let's move on to number 8.  The question we
22   asked you was to explain whether or not you were
23   monetarily charged in connection with any of the calls
24   and if so, who charged you and what amount.
25        Did I read that correctly?

Page 94

1    A    Yes.
2    Q    And you answered N/A, correct?
3    A    That's what it looks like.
4    Q    Can you -- I don't really know what that
5    means.  Can you explain what N/A means?
6         MR. VAHANIAN: I don't normally jump into
7    depositions, but she sent me an email to clarify
8    what N/A means, but essentially no.  Is that fair
9    to say?
10        THE WITNESS: Yes.
11        MR. VAHANIAN: Not to answer for my client.
12   A    My attorney actually prepared the actual
13   answer.  So what he meant by N/A, I don't know, but
14   the answer is no.
15   Q    The answer is no?
16   A    No.
17   Q    I just wanted to clarify.
18   A    That's why I hesitated for a moment.
19        MR. VAHANIAN: That's my fancy way of
20   saying no.
21        MS. HAMILTON: Good to know.
22   Q    Number 9 is the same question.  We asked
23   you to identify any payment you made for charges
24   incurred in connection with the calls.  Again the
25   answer is N/A.

Page 95

1         Is that again --
2    A    I did not make any payments for charges I
3    incurred in connection with the calls.
4         MS. VAHANIAN: I also noticed these
5    interrogatories are not verified.  Can we get
6    these verified?
7         MR. VAHANIAN: Sure.
8         MS. HAMILTON: Okay.  Thank you.  Moving on
9    to Exhibit 14.
10        MR. VAHANIAN: Can I take a quick break?
11        MS. HAMILTON: Absolutely.
12        (Recess taken.)
13        MS. HAMILTON: I'm marking what I believe
14   is Exhibit 14.
15        (Thereupon, Deposition Exhibit No. 14 was
16   marked for identification.)
17   Q    Do you recognize this document, Mr. Klein?
18   A    I do not because I haven't seen it in this
19   form.  But I can identify that it's my answers to the
20   first request for production of documents.
21   Q    So just turning to request 19, and this is
22   similar to the questions I just asked you, we asked
23   you to produce all documents reflecting any charges
24   that were made and/or paid by you relating to the
25   calls.  And again the answer is N/A.

Page 96

1         Can you clarify what N/A means?
2    A    I'm going to rely on my attorney's
3    representation that there aren't any.
4    Q    Is that true, as far as you know?
5    A    Yes.
6    Q    That's the only question I have as to that
7    exhibit.
8         Turning back to the Amended Complaint,
9    which again I lost in the past two seconds, we're
10   going to discuss damages.  I'm going to ask you some
11   questions about damages.
12        In paragraph 23 of your Amended Complaint,
13   you allege that you suffer from two medical
14   conditions.  The first being Major Depressive Disorder
15   and the second one being Generalized Anxiety Disorder.
16        Is that allegation correct?
17   A    Yes.
18   Q    When were you diagnosed with Major
19   Depressive Disorder?
20   A    I believe my first diagnosis of Major
21   Depressive Disorder would have been somewhere around
22   2007 or 2008.
23   Q    What is Major Depressive Disorder?
24   A    Well, I mean Major Depressive Disorder is
25   what I understand to be the medical term for what's

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Jeffrey Frank Klein
December 23, 2015

Page 97

1  commonly known as depression.
2  Q   Who diagnosed you?
3  A   It would have been a therapist.  I don't
4  remember her name.  I was also seeing a general
5  practice doctor, an internist, at the time who also
6  might have diagnosed me with depression at the time.
7  Q   2007?
8  A   Yeah.
9  Q   So you don't recall whether it was a
10 general practitioner or a therapist who diagnosed you?
11 A   No, I don't.
12 Q   Is there a difference between Major
13 Depressive Disorder and depression?
14     MR. VAHANIAN: I'm going to object to the
15     extent that he's not a medical expert.
16 Q   To the extent you know.  You are alleging
17 you have this condition.  If you don't know, you can
18 say that.
19 A   My understanding is that depression is just
20 the common term for Major -- or --
21 Q   Okay.  Have you been put on medication for
22 depression?
23 A   I have.
24 Q   What medication?
25 A   It's mostly been Wellbutrin.  I was for a

Page 98

1  period on Wellbutrin and another medication.  And I
2  don't recall.  But that was years ago before this
3  lawsuit.
4  Q   So at what times in your life were you
5  taking medication for depression?
6  A   Began taking medication for depression the
7  first time in 2011.
8  Q   Who prescribed it for you?
9  A   That would have been a psychologist in
10 Bowling Green.  I don't have her name.
11 Q   How long were you on it?
12 A   At that point I was on it until
13 approximately May of 2013.
14 Q   Did you start taking it again at any point?
15 A   I began taking it again in October -- maybe
16 November of 2013, October, November, sometime in that
17 range.
18 Q   Who prescribed it to you at that time?
19 A   That would have been my internist,
20 Dr. Scott Carnivale.
21 Q   Spell his last name for me.
22 A   C-a-r-n-i-v-a-l-e.
23 Q   Where is he located?
24 A   He's in Brentwood.
25 Q   Here in Pittsburgh?

Page 99

1  A   Yes.
2  Q   And are you still on Wellbutrin right now?
3  A   Tongue twister.
4  Q   It is.
5  A   I'm not currently.
6  Q   When did you stop taking it?
7  A   I would estimate October of this year,
8  could have been November, but I think October is more
9  accurate.
10 Q   I didn't see any medical records related to
11 depression that you produced.
12     Did you produce any medical records related
13 to depression that I missed?
14 A   I didn't produce any medical records to my
15 attorney.  My attorney acquired them on his own.  So I
16 can't speak as to what he would have produced to you.
17     MR. VAHANIAN: Well, I'm trying to
18     understand your question.  I mean the therapy
19     notes that were provided certainly speak to
20     depressive disorder.  So I guess I'm not clear
21     what you are asking.
22     MS. HAMILTON: So you are saying there is.
23     I'll have to go back and look at them again.
24 A   I can't speak to what medical records were
25 produced because I didn't produce them.

Page 100

1  Q   So, were any medical records produced
2  apart -- we'll get to that later.
3     Moving on to your Generalized Anxiety
4  Disorder, when were you diagnosed with this?
5  A   Would have been the same time as
6  depression.
7  Q   And is Generalized Anxiety Disorder
8  different from anxiety?  I'm sorry, I don't know.
9     MR. VAHANIAN: Object again.
10 A   Again as a lay person, I understand one to
11 be the colloquial expression of the other, but I
12 don't -- in common parlance these things are very
13 nuanced in how they are thought of generally.
14     I allege Major Depressive Disorder and
15 Generalized Anxiety Disorder because those are the
16 actual diagnoses that I was diagnosed with.  But I
17 can't answer --
18     MR. VAHANIAN: Let me clarify for the
19     record, too.  The documents that I produced from
20     Dr. Gregson, that's not the complete -- I got those --
21     I expedited those records to get to you so you would
22     have them in time for the deposition.  If there's
23     additional records out there to get, I will get them.
24     That's what I got in the sort of short time frame that
25     I had to get you those records.  So --

Jeffrey Frank Klein
December 23, 2015

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Page 101

1    MS. HAMILTON: Are there more records
2  coming?
3    MR. VAHANIAN: I don't know.
4    MS. HAMILTON: Discovery ends very soon.
5    MR. VAHANIAN: Right. I mean that's what I
6  was given. So I did my absolute best to get the
7  records that I could. It often takes a long time
8  to get medical records. I got what I felt were
9  the most pressing and important records.
10    MS. HAMILTON: I understand. From your
11  perspective, we need to know what your evidence
12  is.
13    MR. VAHANIAN: Sure, I understand.
14    MS. HAMILTON: Are you going to be relying
15  on something in this case other than what you've
16  already produced?
17    MR. VAHANIAN: I guess I made the request
18  to Dr. Gregson, those were the records that were
19  produced pursuant to that request.
20    I made a request to Dr. Carnivale for his
21  records. I did not receive those yet. So I
22  don't know what they are going to say. As soon
23  as I get them, you will get them.
24    MS. HAMILTON: Okay.
25    Q    In paragraph 24 of your First Amended

Page 102

1  Complaint, you allege that the debt collection calls
2  have led to aggravation of your depression and
3  anxiety.
4    A    Correct.
5    Q    And this includes -- dysphoria is the first
6  symptom you list, correct?
7    A    Correct.
8    Q    What is dysphoria?
9    A    Generalized lack of energy, lack of
10  enthusiasm. If you think of euphoria as being an
11  excited state, excited mental state, where you are
12  very energized, very happy, generally speaking,
13  dysphoria would be the exact polar opposite of that.
14    Q    Is this a medical condition you were ever
15  diagnosed with by a doctor?
16    A    Well, this isn't a medical condition, it is
17  a symptom. But yes, I have been diagnosed with that
18  symptom.
19    Q    Who diagnosed you with having this symptom?
20    A    Dr. Gregson.
21    Q    Which doctor? I'm sorry.
22    A    Gregson.
23    Q    How do you spell that?
24    A    G-r-e-g-s-o-n.
25    Q    Is that the --

Page 103

1    A    That's the therapist.
2    Q    That's the therapist, okay.
3    When did you begin to suffer from
4  dysphoria?
5    A    When did I begin to suffer? I mean
6  dysphoria is a symptom that's been present throughout
7  my depression and anxiety before I was diagnosed.
8    When did I first start to suffer from it?
9  When I first started to suffer from depression.
10    Q    So 2007, approximately?
11    A    Well, it would have been before then that I
12  first started suffering from depression.
13    Q    They predated the calls, so we can agree on
14  that?
15    A    Yes.
16    Q    How did the calls increase your dysphoria,
17  the debt collection calls to be clear?
18    A    I understand. The calls themselves would
19  typically act as a trigger. And when those calls
20  would happen, it would send me into a depressive state
21  that the end result of which would oftentimes be going
22  home and climbing into bed and not leaving for a day
23  or two, to not going out to doing things that I
24  normally went out and did, for losing my enthusiasm
25  and energy, for a general sense of helplessness, of

Page 104

1  uselessness, of worthlessness.
2    So as the calls continued and persisted,
3  those periods got longer and more intense. And so the
4  symptoms continued to just grow and get worse as the
5  calls continued to go on.
6    Q    You list a variety of symptoms, dysphoria,
7  loss of sleep, hyperinsomnia --
8    A    Hypersomnia.
9    Q    Hypersomnia. Fatigue, inability to
10  concentrate, difficulty in performing essential work
11  and school functions, racing heart, headaches, tension
12  and other symptoms.
13    Are there any other symptoms we should be
14  aware of?
15    A    I did not allege other symptoms. That is
16  not in the Complaint.
17    Q    Well, let's take a look.
18    A    Paragraph 24.
19    Q    It says symptoms including but not limited
20  to.
21    A    Okay.
22    Q    So what other symptoms are you alleging?
23    A    I mean those are the primary ones. Any
24  other symptoms would have been related to those
25  symptoms. I don't have any off the top of my head. I

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Jeffrey Frank Klein
December 23, 2015

Page 105

1 tried to make an exhaustive list, but I wanted to say
2 not limited to in case, in my recollection, I missed
3 something. But that's primarily what I recall as
4 being my symptoms.
5    Q    So instead of parsing out each of these
6 symptoms one by one, is it fair to say that these
7 symptoms are related in the sense that --
8    A    Well, they are all symptoms of depression.
9 So yes, in that sense they are.
10    Q    So I note you talked about it a little bit.
11        Can you elaborate on why receiving phone
12 calls would cause these symptoms?
13    A    Well, as I said, the phone calls acted as a
14 trigger for my depression. And a lot of that had to
15 do with just how pervasive and ongoing of an invasion
16 they were into my life and how utterly out of control
17 I was to do anything at all about them. For a year
18 and a half, three times a week, I was receiving phone
19 calls to the wrong number. And even after I asked
20 them to stop, they didn't. And so I mean it just
21 continued, this idea that I had no control over this
22 aspect of my life and then by projection any aspect of
23 my life. That's kind of how depression works. When
24 depression is triggered, it's all consuming. It takes
25 over your life completely, as it did with me.

Page 106

1    Q    You mentioned earlier that the calls led to
2 feelings of being made to feel worthless?
3    A    Uh-huh, yes.
4    Q    Why would receiving a phone call make you
5 feel worthless?
6    A    You know, they are all part and parcel to
7 the same kind of general -- I guess categories of
8 feelings. It's easy to look from a detached
9 standpoint on these rationally and say, well, a phone
10 call shouldn't make you feel worthless. But in the
11 moment and when you are really in the depth of a
12 depressive disorder and depressive episodes,
13 unfortunately, you don't see things that clearly. And
14 I really felt completely out of control with my life
15 and every aspect of it.
16        It caused me to not care about people that
17 I was close to anymore, about things that I loved and
18 was passionate about anymore. And yeah, that leads to
19 just feelings of worthlessness.
20        And also it's kind of cumulative in the
21 sense that being aware that I'm letting these
22 things -- even though I have no control over them, but
23 there's this sense that I'm letting them control me in
24 that way that makes me feel even more powerless and
25 more worthless, more out of control of everything. It

Page 107

1 really kind of snowballs and gets out of control very
2 easily and very quickly. So --
3    Q    You've stated that they made you feel out
4 of control, correct?
5    A    Yes.
6    Q    You could have disassociated your cell
7 phone from your Google account at any time, couldn't
8 you have?
9    A    Yes.
10    Q    And you stated that you called -- you
11 attempted to alert Just Energy twice, correct, that
12 they had the wrong number?
13    A    Correct.
14    Q    The last one being in either late December
15 2013 early January 2014?
16    A    Correct.
17    Q    And you never called them again after that?
18    A    Correct.
19    Q    So you allowed calls to persist for eight
20 months without calling them again, correct?
21        MR. VAHANIAN: I don't think it's fair to
22    characterize that as allowing the calls to
23    persist.
24        MS. HAMILTON: I'll rephrase.
25    Q    The calls persisted for eight months and

Page 108

1 you didn't call them again?
2    A    That's correct.
3    Q    What medical treatment did you seek as a
4 result of these telephone calls?
5    A    I went back on antidepressants. I went
6 back on the Wellbutrin. And I started seeing a
7 therapist.
8    Q    Who prescribed the Wellbutrin?
9    A    Dr. Carnivale.
10    Q    Dr. Carnivale?
11    A    The internist.
12    Q    That's your internist. And you went to see
13 the therapist, Dr. Gregson?
14    A    Gregson, yes.
15    Q    Other than Wellbutrin, when did you start
16 the Wellbutrin again?
17    A    Probably October of 2013, but it could have
18 been November.
19    Q    That was prescribed by your internist?
20    A    Correct.
21    Q    Were you put on any other medications?
22    A    No.
23    Q    What monetary expenses have you incurred as
24 a result of your treatments?
25    A    Co-pays for the doctor's visits and co-pays

Jeffrey Frank Klein
December 23, 2015

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

---

Page 109

1 for the medication, and that's it.
2       MS. HAMILTON: We haven't received any
3 documentation of these sorts of damages. Are you
4 going to produce anything?
5       THE WITNESS: I don't know what records I
6 have.
7       MR. VAHANIAN: I'm certainly willing to if
8 we can obtain them.
9       THE WITNESS: I imagine Dr. Gregson has
10 record of what we paid him. So we can look into
11 that.
12   Q    Can you give me a rough estimate of how
13 much money we are talking about here?
14   A    Unfortunately, I can't.
15   Q    Would it be fair to say it's probably less
16 than $1,000?
17   A    Probably, yes.
18   Q    Because I believe you said the co-pays for
19 Dr. Gregson were $5 a visit?
20   A    Correct.
21   Q    What were the co-pays for your medication?
22   A    I believe they were also $5. Might have
23 been 10. Sometimes antidepressants are a little bit
24 more. But in the 5 to 10 dollar range. I think 5
25 though.

---

Page 110

1   Q    Who in your life witnessed your depression
2 related to these telephone calls, these debt
3 collection calls?
4   A    I don't know that I can give an exhaustive
5 list of that mainly because what people may or may not
6 have observed when I was out in the general public or
7 what they realized, I don't know. But generally
8 speaking, I put on a pretty good public face. So
9 usually I would go home where I was alone and that's
10 when I would -- you know, when I was triggered, I
11 would go home and I was alone there. So I don't even
12 think that my roommate even knew what was going on.
13   Q    What's your roommate's name?
14   A    Name is Andrew Harrington.
15   Q    That name sounds familiar to me. I wonder
16 why.
17       What's his phone number or contact
18 information?
19   A    Same address as mine. I don't have his
20 phone number offhand.
21   Q    And he lived with you during the time
22 period when these phone calls were made?
23   A    He has been my roommate since I moved to
24 Pittsburgh, which was July 31 of 2013 or August 1,
25 2013, one of those dates. Before that, I lived on my

---

Page 111

1 own.
2   Q    You dated a woman named Madison during the
3 time period when these phone calls occurred, correct?
4   A    Correct.
5   Q    What is her full name?
6   A    Madison Sullivan.
7   Q    What's her contact information?
8   A    It is in my contact list. I don't know the
9 number offhand.
10   Q    You can get it for me, I'm assuming?
11   A    Sure. Sure.
12   Q    And when were you dating her?
13   A    On and off, we began dating in October of
14 2013 and we stopped dating in May of this year.
15   Q    So you were dating during this time period
16 that these phone calls were occurring?
17   A    Yes.
18   Q    You allege that these phone calls caused
19 you difficulty performing school functions?
20   A    Yes.
21   Q    Can you be more specific?
22   A    Well, when I was in -- let me start early
23 on. When these began, I was at Bowling Green State
24 University working on my Master's thesis. During the
25 summer when I was supposed to have really been working

---

Page 112

1 on finishing the Master's thesis, this was in the
2 heart of the phone calls and I pretty much spent every
3 day under a blanket on my couch with a pile of
4 research next to me. A thesis that ultimately took me
5 three weeks to write, I was unable to work on during
6 that time period. And see, I was unable to finish my
7 degree on time as a result of this.
8       Once I was at Pitt, when I began
9 medicating, that helped a lot. But it still became
10 difficult sometimes to even get out of bed in the
11 morning or to sit down and work on doing research or
12 assignments for classes. And so, you know, ultimately
13 I did well with my grades, but not without significant
14 additional burden in the form of not doing these
15 assignments on time and sometimes having to kind of
16 wing it a little bit, if you will.
17   Q    Who was your faculty adviser in association
18 with your degree at Bowling Green?
19   A    Katherine Meizel.
20   Q    Can you spell her last name, please?
21   A    M-e-i-z-e-l.
22   Q    Do you have her contact information?
23   A    Actually, I don't have any contact
24 information from her other than she's at the College
25 of Musical Arts at Bowling Green University.

---

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Jeffrey Frank Klein
December 23, 2015

Page 113

1  Q    What other professors at Bowling Green were
2  associated with course work that you had difficulty
3  completing?
4  A    With course work, I actually believe that
5  Kathy was the only professor for a class that I was
6  taking at Bowling Green during that time. I only took
7  one class that semester.
8  Q    Who was your faculty adviser at Pitt during
9  the time of these calls?
10  A    I don't have a faculty adviser at Pitt yet.
11  I mean I do now for my dissertation, but that has been
12  subsequent to the phone calls. I didn't at the time.
13  Q    So what professors were associated with the
14  course work you had difficulty completing at Pitt?
15  A    Could I just produce a copy of a transcript
16  because I took three or four classes each term? I
17  don't want to miss any professors or classes that I
18  took. I can try to make a list --
19  Q    Why don't you try right now and then also
20  produce the record.
21  A    Okay. Andrew Weintraub, Gavin Steingo,
22  S-t-e-i-n-g-o, James Cassaro. They are all in the
23  music department so far. Emily Zazulia. I'll spell
24  that, Z-a-z-u-l-i-a. Rachel Mundy, M-u-n-d-y.
25  Actually, Rachel I think was after these calls. I

Page 114

1  think she was just last semester. So not Rachel
2  Mundy.
3      Outside of music, there was one outside of
4  music and I don't remember his name. He's in the
5  German department. I don't know why I can't remember
6  his name.
7      I can today or tomorrow print out an
8  unofficial transcript. Hopefully, it has all the
9  professor names on it, and I'll get it to my attorney.
10  Q    Is there anyone else in your life who can
11  testify to these calls affecting you physically?
12  A    I don't know. I might have mentioned them
13  to my father. But he's in Detroit and he wouldn't
14  have actually seen anything. I don't know that I
15  mentioned them in any particular detail. I don't
16  really share things like that with him.
17  Q    What's your father's name?
18  A    Coleman Klein. C-o-l-e-m-a-n.
19  Q    What is his phone number?
20  A    (248) 681-5335.
21  Q    Anybody else?
22  A    Not that I can think of, no.
23      (Thereupon, Deposition Exhibit No. 15 was
24  marked for identification.)
25  Q    I've marked Exhibit 15. Mr. Klein, these

Page 115

1  are records that your attorney produced to me.
2  They are records from Cognitive Dynamic Therapy
3  Associates.
4      Is this the institution that's connected
5  with Dr. Gregson?
6  A    Yes.
7  Q    It appears that you started treatment in
8  November of 2013; is that correct?
9  A    That sounds right, yes.
10  Q    Based on these records, it looks like you
11  proceeded with therapy through May 6, 2014, correct?
12  A    Correct. Well, actually I shouldn't say
13  correct without looking. Hold on just a moment. That
14  sounds right. But I just want to make sure. That
15  must be a two, okay. Yeah, that's a two. That looks
16  like a seven. Yeah, these records cease on May 6 of
17  2014.
18  Q    I can represent to you we have records that
19  picked up again in March 2015 and they go through
20  October 2015.
21      Is that consistent with your recollection
22  of when you received therapy?
23  A    That sounds consistent, yes.
24  Q    So it appears that there was a large break
25  in the therapy between May 2014 and March 2015.

Page 116

1      Is that consistent with your memory?
2  A    Yes.
3  Q    Why is there a large break there?
4  A    I actually traveled during the Summer of
5  2014 for FieldWorks. I wasn't in town to receive
6  treatment anymore. And when I returned, I just wanted
7  to see how I was doing on my own.
8  Q    And was this the trip to Nepal?
9  A    Yes.
10  Q    When were you in Nepal?
11  A    May -- began in May of 2014 and it was a
12  five-week trip, so it would have been at the end of
13  June 2014.
14  Q    Were you out of town for any significant
15  periods of time apart from that in 2014?
16  A    No.
17  Q    Are you alleging in this case that you
18  received -- aside from your treatment at Cognitive
19  Dynamic Therapy Associates, what other treatment are
20  you alleging in this case that you received relative
21  to these calls?
22  A    What other therapy or psychological
23  treatment?
24  Q    Medical treatment specifically.
25  A    Medical treatment. I saw my internist to

**Page 117**

1  get prescriptions, but that's it.
2  Q    And are you alleging that those
3  prescriptions were directly related to these debt
4  collection phone calls?
5  A    Yes.
6  Q    What type of treatment did you receive at
7  Cognitive Dynamic Therapy Associates?
8  A    Therapy. I'm not a professional, so I
9  don't know how to answer that in any more detail than
10  that.
11  Q    Okay. Cognitive Dynamic Therapy
12  Associates, these are not medical doctors though,
13  correct?
14  A    I believe that Dr. Gregson is a Ph.D., not
15  a medical doctor.
16  Q    Did you get any medications prescribed by
17  Dr. Gregson?
18  A    No, he's not licensed to prescribe, no.
19  Q    Did you seek this treatment upon doctor's
20  orders or did you seek it out yourself?
21  A    I sought it myself.
22  Q    Reading through these records, it appears
23  you discussed many issues in addition to and apart
24  from the debt collection calls; is that fair?
25  A    Yes.

**Page 118**

1  Q    There is a lot of talk about romantic
2  issues in your life. You discuss with your therapist
3  your issues with procrastination. Is that correct?
4  A    I have discussed that with him, yes.
5  Q    You've discussed with your therapist guilt
6  related to your daughter. Is that correct?
7  A    Probably, yeah.
8  Q    You discussed with your therapist your
9  disappointment and frustration of not being included
10  in a competition with Quidditch. Am I reading that
11  correctly?
12  A    You are reading that.
13  Q    I have to know. What is --
14  MR. VAHANIAN: What?
15  MS. HAMILTON: Quidditch.
16  Q    Can you explain what that is?
17  A    It's a live or a real world version of the
18  game that is included in the Harry Potter literature
19  series.
20  Q    How does that work, since we can't fly?
21  A    You run instead.
22  Q    So you discussed frustrations with that
23  situation with your therapist, correct?
24  A    I did.
25  Q    You discussed concerns in April of 2015

**Page 119**

1  about not being allowed to continue in your academic
2  program?
3  A    In April of 2015?
4  Q    Yes.
5  A    I would need a refresher. But there was a
6  point at which I was concerned about my future in the
7  program, yes. I don't recall when that was.
8  Q    You discussed with your therapist your
9  worries about a woman named Madison, correct?
10  A    Correct.
11  Q    Your worried about Madison's parents --
12  mother's view of your relationship, correct?
13  A    I did, yeah.
14  Q    You discussed with your therapist a lot of
15  concerns about your financial situation, correct?
16  A    I did.
17  Q    You discussed with your therapist traumas
18  that led to your career change, correct?
19  A    I did.
20  Q    You discussed with your therapist your
21  disappointment at not being awarded a scholarship; is
22  that correct?
23  A    When was that?
24  Q    I don't have a date listed here. If you
25  don't recall, that's fine.

**Page 120**

1  A    It might have been Nationality Room
2  Scholarship that I was a finalist for, but did not
3  receive. So that's possible.
4  Q    You discussed with your therapist issues
5  related to your father and his approval and
6  disapproval of you?
7  A    Probably.
8  Q    You discussed with your therapist issues
9  about family members invading your personal space,
10  correct?
11  A    That would probably be my grandmother.
12  Yeah, I probably mentioned that, yes.
13  Q    Your history of being aggressed and
14  encroached upon by peers?
15  A    Aggressed or encroached upon.
16  Q    It's hard to read your therapist's
17  handwriting.
18  A    I pause also because I've never seen these
19  notes before. So I don't know what he is thinking of
20  when he wrote down the notes. I mean it's possible.
21  Q    Did you also discuss with your therapist
22  how others view your lifestyle and interests?
23  A    Sure.
24  Q    Would you agree that these issues are
25  issues that are separate issues from the debt

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Jeffrey Frank Klein
December 23, 2015

Page 121

1  collection phone calls?
2      A    Some of them are.
3      Q    Which ones are not?
4      A    Well, my ability to continue in the program
5  was a direct result of concerns I had about my
6  performance in the program.  And that relates to my
7  ability to carry out my school functions.  But
8  certainly issues regarding -- well, I was also
9  concerned about my relationship with Madison at times.
10  It's difficult to be in a relationship when you get
11  angry every time she calls you on the phone.  It's
12  difficult to -- I mean I can't say that those are
13  completely unrelated.  But I would say in general that
14  the issues that you have outlined in that list are
15  separate from the allegations in this case.
16      Q    So is it fair to say that you are seeking
17  treatment for issues in addition to the debt
18  collection phone calls?
19      A    I was seeking treatment for my depression.
20      Q    Can we agree that these issues we just went
21  through were also contributing factors to your
22  depression?
23      A    Certainly.
24          MS. HAMILTON:  Can we take a break for a
25  moment?

Page 122

1          (Recess taken.)
2      Q    You've received therapy in the past in
3  addition to the therapy from Cognitive Dynamic Therapy
4  Associates, correct?
5      A    Yes.
6      Q    Can you go through that for me?
7      A    I recall receiving therapy from three
8  sources.  One was a woman whose name I don't remember.
9  And unfortunately, I don't have any records from that
10  time period.  But I received therapy from a woman in
11  Ann Arbor or the Ann Arbor area around 2007, 2008.  I
12  saw her for a while.  She referred me to a group for
13  group therapy.  When I went to that group, I liked
14  that therapist a lot.  I felt I connected well with
15  him.  So I switched from the first therapist to the
16  second therapist.  His --
17      Q    Can we just back up one minute to the first
18  therapy in 2007?  This was a therapist in Ann Arbor
19  whose name you don't recall, correct?
20      A    Correct.
21      Q    Why were you seeking therapy at that time?
22      A    Depression.
23      Q    What about your anxiety?
24      A    Well, at the time I wasn't really aware of
25  how those things were related or that they were

Page 123

1  different diagnoses or things like that.  From my
2  standpoint, I was seeking treatment for depression.
3  But those two disorders is what was actually going on
4  from a diagnostic standpoint.
5      Q    So why did you switch to group therapy?
6      A    Well, at the time I wasn't switching to
7  group therapy.  I was doing group therapy as a
8  supplement to my individual therapy.  When I had met
9  with that therapist, I felt a better connection with
10  him as a therapist.  And so while I was in group
11  therapy, I also switched my individual therapy to that
12  therapist.  His name I believe was Ken Land, I think.
13      Q    How long did you see Ken Land for?
14      A    Six months to a year.  It wasn't too
15  long.
16      Q    Was this also for treatment of depression?
17      A    Yes.
18      Q    Any others?
19      A    When I was in Bowling Green, I sought
20  treatment for depression.  That was through -- it was
21  a community offered, basically like a pro bono
22  treatment.  I don't recall what the name of that
23  organization was.  It would probably be pretty easy to
24  track down on a Google search.  That doctor's name was
25  Dr. Solomon I think.  But I saw her while I was in

Page 124

1  Bowling Green.
2      Q    Do you remember her first name?
3      A    I do not.  I want to say Linda, but I'm not
4  sure that that was it.
5      Q    How long did you see her for?
6      A    I saw her beginning in probably January of
7  2012 until shortly before I left for Pittsburgh in
8  July of 2013.  I don't know if I saw her right up to
9  the end, but pretty close to the end.
10      Q    Were you seeing her for depression as well?
11      A    Yes.
12      Q    Did she prescribe any medications?
13      A    She did.
14      Q    What?
15      A    Wellbutrin.  She was the one who
16  described -- sorry, she was the one who prescribed the
17  other medication in conjunction with the Wellbutrin
18  and I don't recall what that was.
19      Q    Was it an antidepressant?
20      A    Yes.  I want to say it started with an A,
21  but I don't remember.
22      Q    Is that all the therapy you've received?
23      A    And then Dr. Gregson, yes.
24      Q    Your intake file says you also received
25  therapy as a child, correct?

Jeffrey Frank Klein
December 23, 2015

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

---

**Page 125**

1   A   Oh, yes.
2   Q   Can you quickly, high level, run through
3   that for me?
4   A   Just child stuff.  My parents were trying
5   to -- my parents actually forced me to go to therapy
6   to address behavior when I was a child.
7   Q   How old were you?
8   A   Oh, I don't remember.  This would have been
9   a couple of incidents.  One probably when I was in
10  junior high school and the other might have been when
11  I was in high school.
12  Q   What were the incidents?
13  A   I mean there were no incidents in
14  particular that led to them.  I didn't mean incident.
15  Like incidences of, for therapy.
16  Q   What?
17  A   They were just like poor performance in
18  school.  Basically that was it.  Poor performance in
19  school.
20  Q   Was this therapy related to depression in
21  any way?
22  A   No.
23  Q   Reading your therapy records, this first
24  chunk, which is from -- which is reflected in this
25  exhibit, which is from November 2013 to May 2014, the

---

**Page 127**

1   ceased in August 2014, correct?
2   A   Correct.
3   Q   So these records begin, let's see, seven
4   months after the calls ceased approximately?
5   A   These records, yes, correct.
6   Q   If we look at the first -- it's actually
7   the first record on the first page, it says Jeff and I
8   discussed his desire for more friends and closeness in
9   his life, his frustration and anxiety related to his
10  lawsuit.
11      Is that reference to the lawsuit, this
12  lawsuit?
13  A   Yes.
14  Q   This is dated March 4, 2015, correct?
15  A   Correct.
16  Q   So you were contemplating -- the lawsuit
17  was going on in March 2014, correct?
18  A   Correct.
19  Q   When were you contemplating bringing this
20  lawsuit?  When did you start thinking about bringing
21  this lawsuit?
22  A   Probably about when I started keeping
23  Exhibit 3 -- or Exhibit 2, Exhibit 2, yes.
24  Q   Which is -- what day would that be, January
25  30th?

---

**Page 126**

1   first mention of the debt collection calls are not
2   until March 18, 2014.
3       Is that consistent with your recollection?
4   A   I actually don't recall when I first
5   mentioned them.
6       MS. HAMILTON: Last exhibit.
7       (Thereupon, Deposition Exhibit No. 16 was
8   marked for identification.)
9   Q   I can represent to you these are the
10  therapy records your attorney provided me with, what I
11  call from the second chunk of time, which would run
12  from October 2015 -- I'm sorry, March 2015 to October
13  2015.
14      Is that consistent with your recollection
15  that you received therapy from March 2015 to October
16  2015?
17  A   Yes, that's consistent.
18  Q   Are you currently in therapy?
19  A   No.
20  Q   Why did you stop?
21  A   I wanted to see how I would do on my own
22  again.
23  Q   When did you stop?
24  A   October.
25  Q   You allege the phone calls in this case

---

**Page 128**

1   A   Sometime in January of 2014.
2   Q   Can we go back to Exhibit 15 real quick?
3   A   Okay.
4   Q   If you look at the third to the last page,
5   the March 25th, 2014 entry --
6   A   Uh-huh.
7   Q   -- it says Jeff and I -- it's J, I assume
8   that's you -- J and I discussed his upcoming lawsuit
9   against the collections agency that continues to call
10  him even though he's requested them to stop.
11      That's a reference to this lawsuit
12  presumably?
13  A   Yes.
14  Q   So it looks like you were contemplating --
15  I keep reading the wrong one.  I'm sorry.  I'm sorry.
16  I grabbed the wrong exhibit.  We need to go to 14.  My
17  error.  Exhibit 14.
18  A   This is the request for production?
19  Q   I'm sorry.  My record is completely messed
20  up here.
21      (Off record.)
22  Q   Let me just rephrase.
23      When did you start contemplating filing
24  this lawsuit?
25  A   Again, I believe in January of 2014.

---

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Jeffrey Frank Klein
December 23, 2015

Page 129

1  Q    And the last time -- the calls continued
2  from January to August 2014, correct?
3  A    Correct.
4  Q    And you were contemplating a lawsuit during
5  that entire time period, correct?
6  A    Correct.
7  Q    And you never called Just Energy again to
8  alert them that they had the wrong number, correct?
9  A    Again, I did not.
10  Q    If we turn to the June 10, 2015 therapy
11  session, which is six pages in, I believe, the first
12  sentence says, J and I discussed the physical
13  distresses he felt in response to the collection
14  agency phone calls he received for which he is filing
15  a lawsuit. Correct?
16  A    That's what it says, yes.
17  Q    And it says, you recounted feelings that
18  your heart is racing, tension of muscles, and anger in
19  response to the phone calls.
20       Is that consistent with your memory of what
21  you discussed with your therapist?
22  A    I mean I did discuss those things with him,
23  yes.
24  Q    And this is dated June 10, 2015, correct?
25  A    Yes.

Page 130

1  Q    Do you recall that in May 2015 Judge Conti
2  dismissed your negligence claim in this lawsuit?
3  A    I don't recall the timing of it, but I do
4  recall that.
5  Q    I can represent to you it was May 27th.
6  A    Fair enough.
7  Q    And you recall in her order she indicated
8  that one has to assert a physical injury in order to
9  assert a negligence claim?
10  A    I recall that, yes.
11  Q    And you amended your Complaint, didn't you?
12  A    I did.
13  Q    And you included allegations of a physical
14  injury?
15  A    Correct.
16  Q    This therapist note where you discuss
17  physical injury is dated June 10, 2015, correct?
18  A    That's what it looks like, yes.
19  Q    That's about two weeks after Judge Conti
20  dismissed your negligence claim?
21  A    Yes.
22  Q    That's some coincidental timing, don't you
23  think?
24       MR. VAHANIAN: Is that a question?
25       MS. HAMILTON: I'll just withdraw that.

Page 131

1  Will you be providing any more medical records in
2  this case?
3       MR. VAHANIAN: I'm going to do my very best
4  to get you the Carnivale as soon as I can.
5       MS. HAMILTON: Aside from Carnivale, is
6  there anybody else?
7       MR. VAHANIAN: I don't think there's
8  anything that's terribly relevant other than
9  Carnivale. I think that should be it.
10       MS. HAMILTON: All right. We are in the
11  home stretch now.
12  Q    I did notice in your therapy records your
13  therapist noted that you have repeated run-ins with
14  companies. Is that true?
15  A    Repeated run-ins with companies?
16  Q    There was an issue with US Air, an issue
17  with an insurance company. Does any of that ring a
18  bell?
19  A    They ring a bell. I'm not sure what the
20  question is though.
21  Q    Have you had repeated run-ins with
22  companies in your life?
23  A    What do you mean by run-ins?
24  Q    Disputes.
25  A    Sure.

Page 132

1  Q    Tell me about a few of them.
2  A    Which one do you want to hear about?
3  Q    The US Air one that the therapist mentioned
4  in his notes.
5  A    That alone could take a while. This was
6  the trip out to Nepal where they lost my luggage on
7  multiple occasions. They bumped me from flights,
8  shipped me to different airports. A number of
9  different things happened on that flight that were out
10  of the ordinary.
11  Q    Did you lodge a complaint?
12  A    I did.
13  Q    Did you sue them?
14  A    No.
15  Q    Why not?
16  A    Don't know what I would sue them for. I
17  don't know if it was worth the trouble. It was a lot
18  of aggravation and it was behind me.
19  Q    Have you had any other significant disputes
20  with companies in your life?
21  A    Significant disputes? I guess it depends
22  what you consider significant. But --
23  Q    Where you affirmatively filed a complaint
24  of some sort.
25  A    No. I consider those two small claims that

Jeffrey Frank Klein
December 23, 2015

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Page 133

1  we discussed earlier about the cell companies not to
2  be significant and small claims. And we already
3  discussed those. Other than that, no.
4      Q    What about -- I believe there was a
5  reference to a dispute with an insurance company.
6          Does that ring a bell?
7      A    Yes. UPMC, a year after paying several
8  claims after I returned from Nepal, rejected certain
9  claims, rejected those claims. And so I'm in the
10 process of trying to straighten things out with them.
11     Q    Have you filed a lawsuit against them?
12     A    I have not.
13     Q    Are you going to?
14     A    I don't know.
15     Q    Is it a possibility?
16     A    Anything is possible.
17     Q    I want to talk a little bit about the
18 damages you are seeking in this case. So if we look
19 at your Amended Complaint Count I, which is for
20 violation of the Telephone Consumer Protection Act --
21     A    Correct.
22     Q    -- in your wherefore clause, it says you
23 are seeking $300,000, plus costs and attorney's fees.
24     A    Correct.
25     Q    How did you come up with the $300,000?

Page 134

1      A    200 phone calls, $1,500 per, equals
2  $300,000. Simple math.
3      Q    You are seeking the treble damages under
4  the telephone --
5      A    Oh, absolutely.
6      Q    Count II for intrusion upon seclusion, you
7  are seeking $4 million in damages?
8      A    That's what I allege in the Complaint, yes.
9      Q    Can you explain to me how you came up with
10 $4 million?
11     A    Sure. Sure. At the time -- at the time
12 that I filed my initial Complaint, not the First
13 Amended Complaint, it was necessary for me to come up
14 with a process by which I could quantify my damages.
15         In the case of something like depression or
16 invasions upon privacy, it's a lot harder to do than
17 when, for example, someone crashes into a car and it
18 costs X number of dollars to repair.
19         And so I wanted to come up with a process
20 that reflected both the extent of my injuries and the
21 nature of how they accumulated over time.
22         What I ultimately -- my first approach was
23 to consider the fact that each call had a cumulative
24 and increasing effect on my condition. It
25 basically -- to put it simply, they just got worse and

Page 135

1  worse as they went along, each one worse than the
2  last. So I wanted to have a theory that reflected the
3  increasing levels of damages, of the invasions, of the
4  willfulness -- I'm not doing well with Englishing
5  right now. But --
6          MR. VAHANIAN: Could it be the distractions
7      going on out there?
8          THE WITNESS: It could be, yes. No, that's
9      probably not it. It's late for me as well.
10     A    So I wanted to base my damages claim on a
11 theory that took into account the facts that these
12 calls were increasing over time, that these calls had
13 a --
14         MS. HAMILTON: There's a child literally
15     pressing his face against the window right now.
16         MR. VAHANIAN: Let the record reflect that
17     the Buchanan Ingersoll Christmas party seems to
18     be in full swing.
19         MS. HAMILTON: Sorry to distract you.
20     A    Maybe that's why I'm having trouble
21 Englishing.
22         -- an increasing effect on me as they went
23 on. What I ultimately decided, my first thought was
24 that each one is twice as bad as the worst. But that
25 involved exponential math that ends up with a

Page 136

1  ridiculous result as far as a number. But I didn't
2  want to do that. And I don't think that's a fair
3  reflection of what I actually went through.
4          So my starting point was to use an average
5  amount that was higher than what the damages for the
6  first call would have been, but significantly lower
7  than what the last call would have been, so something
8  that was kind of a middle ground average that I then
9  multiplied by the 200 phone calls. That number was
10 $20,000. 20,000 times 200 is 4 million.
11     Q    So you stated you didn't want a ridiculous
12 number, correct?
13     A    Correct.
14     Q    And it's your position that $4 million is
15 not a ridiculous number?
16     A    Under the circumstances, not at all. I see
17 that you disagree.
18     Q    Well, what I think is irrelevant. So --
19     A    True.
20     Q    Why do you think $4 million is a reasonable
21 amount of money for receiving phone calls?
22         MR. VAHANIAN: I think that was asked and
23     answered. I'm going to object.
24         THE WITNESS: I'll leave it to you.
25         MR. VAHANIAN: You can answer.

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Jeffrey Frank Klein
December 23, 2015

---

Page 137

1    Q    Why is that a reasonable number to you?
2    A    We can always bring in the judge later.
3 Fair enough.
4       I think based upon the circumstances of
5 this case, I think especially based on the
6 extraordinarily large number of phone calls, the fact
7 that this is not just a problem that exists for me,
8 but this is a pervasive problem that's one of the most
9 significant problems that affects consumers in America
10 on any everyday basis, these unwarranted, these
11 unwanted, these obnoxious, egregious intrusions upon
12 their lives, especially in an age where you have cell
13 phones that you can't just turn off and you can't walk
14 away from, you are constantly at the whim of people
15 who decide to dial your number and you have no control
16 over it.
17       I think based upon those factors, based
18 upon how profoundly they affected me, based upon how
19 profoundly they affected my life and my relationships,
20 that $4 million isn't even a drop in the bucket for
21 what I went through and the torture that I was
22 subjected to at the hands of your client, frankly.
23    Q    So you were tortured by these debt
24 collection phone calls?
25    A    I felt tortured by these debt collection

---

Page 138

1 phone calls, absolutely.
2    Q    Is it your position that people who consume
3 services and don't pay for them should not be
4 subjected to debt collection phone calls?
5    A    No.
6    Q    So if someone owes a legitimate debt, are
7 you offended by the idea that they would receive phone
8 calls from companies seeking to collect on this debt?
9    A    I believe -- I can't answer that as a yes
10 or no question because I believe it oversimplifies it.
11 I believe that people who are owed money have a right
12 to try and collect those within certain parameters. I
13 think that making a few calls over the course of a few
14 weeks is reasonable. I believe that making over 200
15 phone calls to the wrong number over the course of a
16 year and a half is so far beyond unreasonable as to be
17 beyond imagination.
18    Q    Do you believe that these debt collection
19 phone calls were purposely going to you as opposed to
20 Phyllis Settles?
21    A    No.
22    Q    Do you have any evidence that you received
23 those calls based solely on an accident?
24    A    Well, I'm not really sure that I understand
25 the question.

---

Page 139

1    Q    Is it possible that you received these
2 phone calls because of an accident, not because you
3 specifically were being targeted?
4    A    Oh, yes, initially.
5    Q    So you recognize that there is a potential
6 here that this was all an accident?
7    A    Initially, yes. But not ongoing for a year
8 and a half and 200 phone calls after I told them to
9 stop and advised them that they had the wrong number,
10 no, absolutely not. But I don't think they were
11 targeted toward me specifically as Jeff Klein, no.
12    Q    So do you think these debt collection
13 calls, they continued them on purpose even after you
14 asked them to stop?
15    A    I have no idea.
16    Q    So, you have no evidence that they knew
17 they had the wrong number, but they decided to keep
18 calling you anyway?
19    A    Sure, I do. Your client provided it.
20    Q    Well, isn't it possible there was an
21 internal mix-up?
22    A    I can't speak to that.
23       MR. VAHANIAN: This is a fact deposition.
24    We are not talking speculation.
25    A    I can't speak to that. I have no idea.

---

Page 140

1       MR. VAHANIAN: I'm not trying to be
2 difficult.
3    A    I have no idea what your client or the
4 representatives did, I have no idea, or why they did
5 it. I can't speculate any more than I have. I have
6 no idea.
7    Q    That's fair. And that's fine. You can say
8 that.
9    A    Yeah.
10    Q    Your last claim is for negligence and you
11 seek $100,000 under that claim, correct?
12    A    That's what I'm alleging here, yes.
13    Q    How did you come up with that $100,000?
14    A    For that one, as I thought about this more,
15 I realized that what I was alleging with respect to
16 negligence was really wholly separate from what I was
17 alleging in terms of invasion of privacy. So it
18 seemed important to me at the time to have some way to
19 reflect that these were not only two separate claims
20 in terms of two separate counts, but two separate
21 theories of recovery. So I wanted it to be different
22 from $4 million.
23    Q    So what does this $100,000 represent?
24    A    To be honest with you, it's a relatively
25 arbitrary number. I don't see any reason why it

---

Jeffrey Frank Klein
December 23, 2015

Jeffrey Frank Klein v.
Just Energy Group, Inc., et al

Page 141

1  shouldn't be any higher than that based upon the facts
2  of the case. But I wanted to make sure that it was an
3  amount in controversy above the jurisdictional limit.
4  And I just wanted to make sure it was different from
5  Count II.
6      I'm going to leave it up to my attorney to
7  make decisions about what a true measure of damages is
8  and to argue that before the jury.
9  Q    Can we agree you are not alleging in this
10 case that you've sustained out-of-pocket expenses of
11 $100,000 as a result of these calls?
12 A    Correct.
13     MS. HAMILTON: I believe that is it.
14     MR. VAHANIAN: Do you want to read or
15 waive?
16     THE WITNESS: What?
17     MR. VAHANIAN: Do you want to read or waive
18 your -- you have the right --
19     THE WITNESS: No, I'm fine.
20     MR. VAHANIAN: We'll waive.
21     (Off record.)
22     MR. VAHANIAN: Back on the record. You
23 have the opportunity to take a look at your
24 deposition transcript essentially before it
25 becomes part of the record in order to correct --

Page 142

1  you can't change substantive testimony -- correct
2  addresses, things like that.
3      THE WITNESS: That's what I assumed it
4  meant. I'll waive. That's fine.
5      (Thereupon, at 4:04 p.m., the deposition
6  was concluded.)

Page 143

1                  CERTIFICATE
2  COMMONWEALTH OF PENNSYLVANIA )
                                ) SS:
3  COUNTY OF ALLEGHENY          )
4      I, Sandra Marchky, do hereby certify that before
5  me, a Notary Public in and for the Commonwealth
   aforesaid, personally appeared JEFFREY FRANK KLEIN,
6  who then was by me first duly cautioned and sworn to
   testify the truth, the whole truth, and nothing but
7  the truth in the taking of his oral deposition in the
   cause aforesaid; that the testimony then given by him
8  as above set forth was by me reduced to stenotype in
   the presence of said witness, and afterwards
9  transcribed by means of computer-aided transcription.
10     I do further certify that this deposition was
   taken at the time and place in the foregoing caption
11 specified, and was completed without adjournment.
12     I do further certify that I am not a relative,
   counsel or attorney of either party, or otherwise
13 interested in the event of this action.
14     IN WITNESS WHEREOF, I have hereunto set my hand
   and affixed my seal of office at Pittsburgh,
15 Pennsylvania, on this __8__ day of January,
   2015.
16
17     _____
18     Sandra Marchky
       Notary Public
19
20            - - -
21
22
23
24
25